# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

———————————

STATE OF KANSAS, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of North Dakota

———————————

## DEFENDANTS-APPELLANTS' EMERGENCY MOTION
## FOR AN ADMINISTRATIVE STAY AND STAY PENDING APPEAL

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

CATHERINE M.A. CARROLL
  *Deputy Assistant Attorney General*

MELISSA N. PATTERSON
LEIF OVERVOLD
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7226*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 305-1754*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

STATEMENT OF THE CASE .....................................................................................1

    A.    Statutory And Regulatory Background .........................................................1

    B.    Prior Proceedings .........................................................................................4

ARGUMENT ...............................................................................................................6

I.    PLAINTIFFS LACK STANDING AND FAILED TO ESTABLISH PROPER VENUE ...............................................................................................................6

    A.    North Dakota Lacks Standing .......................................................................7

    B.    Venue In North Dakota Is Improper Regardless Of Other Plaintiffs' Standing Arguments .....................................................................11

II.    THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS ......................... 12

III.    THE EQUITABLE FACTORS OVERWHELMINGLY FAVOR A STAY ........................ 18

    A.    A Stay Will Prevent Irreparable Harm To Individuals Who Reasonably Relied On The Rule And To The Public Interest ................18

    B.    The Injunction Is Unnecessary To Prevent Irreparable Harm To Plaintiffs, Whose Own Delay Supports A Stay ..........................................20

CONCLUSION ......................................................................................................... 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

**INTRODUCTION**

In the middle of the open-enrollment period, during which millions of people use Affordable Care Act (ACA) exchanges to obtain health insurance, the district court issued a preliminary injunction forcing disruptive changes to those exchanges and the cancellation of thousands of health-insurance policies for recipients of Deferred Action for Childhood Arrivals (DACA). That injunction was issued under an incorrect standard, based on a State-standing analysis the Supreme Court has rejected, by a court lacking venue, and in unacknowledged contravention of the well-established understanding of the statutory text at issue. These defects and equitable considerations strongly support staying the injunction pending appeal, thus preventing certain and significant harm to the public and individuals who reasonably relied on the challenged health-insurance rule, at little if any cost to the plaintiff States. To comply with the injunction, the federal government will significantly alter its health-insurance exchanges on December 22, 2024, and begin the cancellation process thereafter; given the technological complexities of halting such system-wide changes, appellants respectfully request that this Court enter either an administrative stay or a stay pending appeal by December 20, 2024. *See generally* R.Doc. 119-1.

**STATEMENT OF THE CASE**

**A.  Statutory And Regulatory Background**

**1.**  The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) generally restricts eligibility for federal public benefits to "qualified

alien[s]." 8 U.S.C. § 1611(a).  That term includes noncitizens admitted for permanent residence and certain others.  *See id.* § 1641(b).  PRWORA also makes clear that, for certain benefits, this restriction does not apply to a separate, broader category: noncitizens "lawfully present in the United States as determined by the Attorney General" (and now the Secretary of Homeland Security).  *Id.* § 1611(b)(2).

The Executive Branch promptly defined "lawfully present" under PRWORA to include noncitizens "in deferred action status."  61 Fed. Reg. 47,039, 47,040 (Sept. 6, 1996); *see* 8 C.F.R. § 1.3(a)(4)(vi).  Congress subsequently amended 8 U.S.C. § 1611 to expand the Executive Branch's ability to deem noncitizens "lawfully present" for certain benefits.  *See* Pub. L. No. 105-33, 111 Stat. 251, § 5561 (Aug. 5, 1997).

**2.**  Against this backdrop, in 2010, Congress enacted the ACA, which requires the creation of an "Exchange" for each State to "make available qualified health plans [(QHPs)] to qualified individuals."  42 U.S.C. § 18031(d)(2)(A).  Some States operate their own State-based Exchanges (SBEs), while others leave these responsibilities to the federal government.  *See id.* §§ 18031(b)(1), 18041(c)(1).  Congress provided that to be "qualified" to enroll in a QHP through their State's exchange, noncitizens must be "lawfully present in the United States."  *Id.* § 18032(f)(3).  The Act directs the Department of Health and Human Services (HHS) to determine eligibility, including whether a noncitizen is "lawfully present in the United States."  *Id.* § 18081(a)(1).  A qualified individual may also be eligible for certain federal subsidies.  *See id.* §§ 18071(b)-(c), 18081, 18082(c); 26 U.S.C. § 36B.

2

Like PRWORA, the ACA authorizes the Executive Branch to define "lawfully present." In 2010, consistent with that term's longstanding meaning under PRWORA, HHS defined it for ACA purposes to include noncitizens "in deferred action status." 75 Fed. Reg. 45,014, 45,030 (July 30, 2010) (codified at 45 C.F.R. § 152.2); *see also* 77 Fed. Reg. 18,310, 18,314, 18,445 (Mar. 27, 2012).

**3.** In 2012, the Department of Homeland Security (DHS) created the DACA program, which established how DHS would exercise its prosecutorial discretion in certain "low priority" removal cases. *See* Memorandum from Secretary Napolitano (June 15, 2012), https://perma.cc/PRR8-PBT7. DACA allows certain noncitizens who came to the United States as children to apply for a renewable two-year period of deferred action during which they generally will not be placed in removal proceedings and can receive employment authorization. *Id.* at 1-3.[1]

HHS amended its definition of "lawfully present" after the DACA memorandum issued, specifically excluding DACA recipients from other deferred-action recipients on policy grounds. 77 Fed. Reg. 52,614, 52,615-16 (Aug. 30, 2012).

**4.** In April 2023, HHS proposed (among other changes) to remove this DACA exception from the definition of "lawfully present." *See* 88 Fed. Reg. 25,313 (Apr. 26, 2023). The final rule was promulgated May 8, 2024, and took effect November 1,

---

[1] In 2022, DHS replaced the 2012 memorandum establishing DACA with a regulation, 87 Fed. Reg. 53,152 (Aug. 30, 2022), which is currently partially enjoined, *see Texas v. United States*, 2023 WL 5950808, at *1 (S.D. Tex. Sept. 13, 2023), *appeal pending*, No. 23-40653 (5th Cir.).

3

2024, coinciding with the open-enrollment period running through January 15, 2025. *See* 89 Fed. Reg. 39,392, 39,415 (May 8, 2024); 45 C.F.R. § 155.410(e)(4). Under the rule, otherwise-eligible DACA recipients can enroll in a QHP through an exchange and apply for federal subsidies. 89 Fed. Reg. at 39,395-96. HHS explained that its previous decision to treat DACA differently than other forms of deferred action "failed to best effectuate congressional intent" and that the rule accorded with DHS's longstanding interpretation of "lawfully present." *Id.* at 39,395.

### B. Prior Proceedings

On August 8, 2024, three months after the final rule issued, North Dakota and fourteen other States challenged the rule in the District of North Dakota. *See* R.Doc. 1. Despite the rule's looming November 1 effective date, the States waited several more weeks to seek a preliminary injunction, by which point four more States had joined the suit. *See* R.Docs. 27, 35. The district court held a preliminary-injunction hearing on October 15 and ordered supplemental filings regarding standing and venue. R.Docs. 84, 87. Defendants moved to dismiss and, in the alternative, to transfer. R.Doc. 108.

On December 9, over a month after enrollment began and after some DACA recipients' health-insurance plans became effective on December 1, the district court granted a preliminary injunction and stay. R.Doc. 117 (Op.); *see* 45 C.F.R. § 155.420(b)(1). The court concluded that North Dakota had standing and that venue there was consequently proper. *See* Op. 7-10. Although North Dakota (like all but

4

three plaintiff States) does not run an ACA exchange, the court found standing based on asserted costs related to the State's 126 DACA-recipient residents. Op. 8. The court did not cite any evidence that such costs were traceable to the final rule or remediable by an order enjoining it. Instead, the court relied on "a common-sense inference[] that the powerful incentive of health care will encourage aliens who may otherwise vacate the [p]laintiff States to remain," "creat[ing] a substantial risk North Dakota will suffer monetary harm via issuing [driver's] licenses and providing education." Op. 9.

The court did not evaluate whether plaintiffs were "likely" to succeed on the merits, determining only that they demonstrated a "fair chance" of doing so, suggesting that only "qualified aliens" under PRWORA could be considered "lawfully present" under the ACA. Op. 11-14. The court rested its irreparable-harm conclusion on the same costs States asserted regarding standing and—presumably referring to the three plaintiff States operating exchanges—the "Hobson's choice" of "comply[ing] with what they believe to be an unlawful directive or los[ing] federal government support" to operate exchanges. Op. 15. Based on the same reasoning, the court granted a stay and denied defendants' motion to dismiss or transfer. Op.

5

17-18. It consequently preliminarily barred defendants from "enforcing the [f]inal [r]ule against the 19 [p]laintiff States." Op. 18.[2]

Appellants filed a motion for a stay pending appeal on December 11, which remains pending in district court. R.Doc. 119.

## ARGUMENT

A motion for stay pending appeal is governed by the four-factor test set out in *Nken v. Holder*, 556 U.S. 418, 425-426 (2009). Each factor supports appellants.

## I. PLAINTIFFS LACK STANDING AND FAILED TO ESTABLISH PROPER VENUE

The district court erred in concluding North Dakota has standing and that venue was thus proper; this Court should reverse on appeal on that basis alone. *See Murthy v. Missouri*, 603 U.S. 43, 56 (2024) (reversing preliminary injunction because plaintiffs lacked standing); *Maybelline Co. v. Noxell Corp.*, 813 F.2d 901, 907 (8th Cir. 1987) (reversing preliminary injunction because district court erred in finding venue).[3]

---

[2] The stay and preliminary injunction appear coextensive, *see* Op. 18, and references herein to the district court's injunction encompass the stay as well.

[3] "[A]n appeal from an order granting … injunctive relief pursuant to 28 U.S.C. § 1292(a)(1) presents for appellate review the entire order, not merely the propriety of injunctive relief." *Maybelline*, 813 F.2d at 903 n.1 (quotation marks omitted). Accordingly, "the district court's denial of the [federal government's] motion to dismiss for improper venue is properly before" this Court. *Id.*

6

## A.     North Dakota Lacks Standing

The district court examined only North Dakota's standing, concluding that it made the requisite showing.  Op. 6-10.  The court acknowledged that North Dakota, like other plaintiff States declining to operate an ACA exchange, suffers no "direct injury from the [f]inal [r]ule" because "the federal government will bear the costs" of expanding exchange eligibility in those States.  Op. 7.  But the court reasoned that alleged indirect financial effects within North Dakota support the State's standing, a conclusion that fails for multiple reasons.

**1.**  Plaintiffs bear the burden of "mak[ing] a 'clear showing' that [they are] 'likely' to establish each element of standing," namely, that they have "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Murthy*, 603 U.S. at 57-58.  When, as here, a plaintiff is not directly regulated by the federal rule they challenge, standing "is ordinarily substantially more difficult to establish" because causation will "hinge[] on the response of the regulated … third part[ies] to the government action."  *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 382-383 (2024) (quotation marks omitted).  In such a case, plaintiffs "cannot 'rely on speculation about the unfettered choices made by independent actors'" and "must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs."  *Id.*

7

**2.** The district court erred in disregarding such principles and relying on expenditures North Dakota makes to provide driver's licenses and education to its residents. According to the court, the final rule will increase such expenditures by incentivizing DACA recipients who might otherwise leave to instead remain. The Supreme Court recently rejected a similar theory, explaining that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). When a State asserts "that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* Thus, the Court held that States' assertions regarding increased education and healthcare costs failed to "overcome[] the fundamental Article III problem with th[eir] lawsuit." *Id.*; *see also Alliance*, 602 U.S. at 383 (cautioning against relying on "ripple effects" in standing analyses).

That reasoning applies here. The final rule does not regulate any State's provision of driver's licenses or public education, and any impact that the rule might have on such expenditures is indirect, attenuated, and of the type that accompanies virtually any federal regulation. The United States' policies regulating the people within a State will often have derivative consequences for the State itself, but deeming States' interest in avoiding such incidental effects legally and judicially cognizable is inconsistent with the autonomy of the national and state sovereigns to act directly upon individuals "'within their respective spheres.'" *Printz v. United States*, 521 U.S.

8

898, 920 (1997). Indeed, the district court's rationale has startling implications, suggesting that any federal action that affects, even indirectly, a State's population creates standing because it may affect that State's expenditures or revenues. *Cf. Alliance*, 602 U.S. at 391 (rejecting an approach under which "[t]eachers in border states could sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms").

**3.** Even if its purported injuries were cognizable, North Dakota did not make a "clear showing" that such harms are "real and immediate," traceable to the final rule, and redressable by an injunction. *Murthy*, 603 U.S. at 58. Rather than increasing plaintiffs' social-service expenditures, the final rule is likely to decrease them. As plaintiffs note, States are obligated to pay certain emergency-healthcare costs of uninsured immigrants. *See* R.Doc. 27, at 11, ¶ 61. The final rule will result in more DACA recipients having health insurance; plaintiffs offer no reason why this change would not reduce their emergency-care burden. *See* 89 Fed. Reg. at 39,406.

Plaintiffs fare no better on traceability or redressability. The district court relied only on what it deemed "a common-sense inference, that the powerful incentive of health care will encourage aliens who may otherwise vacate the [p]laintiff States to remain." Op. 9. But that "inference" amounts to impermissible "speculation about the unfettered choices" of third parties, not a "show[ing] that [they] will likely react in predictable ways" causing injury. *Alliance*, 602 U.S. at 383 (quotation marks omitted). The district court cited (Op. 9) *Department of Commerce v.*

9

*New York*, 588 U.S. 752 (2019), and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), but those cases held that a district court may make reasonable inferences from evidence presented at trial. Here, the district court relied on no such evidence.

Next, even if free-floating judicial predictions sufficed to establish standing, the district court's inference is unreasonable because it assumes the premise that there are "aliens who may otherwise vacate the [p]laintiff States." Op. 9. DACA recipients have necessarily resided in the United States since at least 2007 without having been eligible for insurance on the exchanges. *See* 8 C.F.R. § 236.22(b)(2). They are generally of an age where they are likely to have established jobs, lives, and families, and there is no reason to think that they would now leave unless they gain such eligibility. "[N]either logic nor intuition" suggests that, after nearly two decades in the United States, any of these individuals is likely to leave imminently simply because they cannot enroll in a QHP for which they have never before qualified. *California v. Texas*, 593 U.S. 659, 676 (2021). The district court's supposition to the contrary is even less plausible given that, although there are an estimated 147,000 uninsured DACA recipients nationwide, there are only 126 residing in North Dakota, only about a quarter of whom are estimated to be uninsured. *See* Op. 8; R.Doc. 103, at 2, ¶ 4; 89 Fed. Reg. at 39,425. Plaintiffs may not rely on "statistical probabilities" to establish standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-499 (2009). But even if they

10

could, the tiny numbers underlying such statistics within North Dakota would make such arguments particularly inappropriate.

**B.    Venue In North Dakota Is Improper Regardless Of Other Plaintiffs' Standing Arguments**

The sole basis on which plaintiffs assert venue is proper in North Dakota is that State's presence in this suit; as the district court recognized, "[f]or venue to be proper" in the District of North Dakota, "North Dakota must have standing independent of the other [p]laintiffs."  Op. 5; *see Georgia Republican Party v. SEC*, 888 F.3d 1198, 1205 (11th Cir. 2018) (concluding court lacked venue once party dismissed on standing grounds).  Because North Dakota lacks standing, the district court should have—at minimum—granted defendants' request to transfer for improper venue.  *See* R.Docs. 61, 108 (requesting dismissal or transfer on venue grounds).  And this Court should vacate the preliminary injunction on that basis alone, "without reaching the merits."  *Maybelline*, 813 F.2d at 903, 907 (reversing preliminary injunction entered where district court incorrectly concluded venue was proper).

Three plaintiff States operating their own exchanges—Idaho, Kentucky, and Virginia—alleged below that the rule directly injured them, which appellants dispute, *see* R.Doc. 61, at 16-19 (noting *inter alia* the absence of future harm remediable by an injunction).  The district court did not reach that issue, and this Court need not do so either.  North Dakota has not alleged any theory of standing other than the one discussed above.  Accordingly, regardless of other plaintiffs' standing arguments, the

District of North Dakota was not the proper venue to address them, and this Court should reverse and remand "with directions to dismiss or to transfer the action." *Maybelline*, 813 F.2d at 907.

## II. THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

Even assuming that plaintiffs could establish standing, appellants are likely to succeed on the merits. Congress specifically empowered HHS to define who is "lawfully present" for ACA purposes, and HHS adopted the understanding of that term that is well established across federal benefits statutes.

**A.** The ACA provides that those "not reasonably expected to be … a citizen or national of the United States or an alien lawfully present in the United States" during an enrollment period are ineligible to enroll in a QHP or receive federal subsidies. 42 U.S.C. § 18032(f)(3). Congress gave HHS the authority to "establish a program … for determining … whether an individual … meets the requirement[] of section[] 18032(f)(3) … that the individual be … an alien lawfully present in the United States." *Id.* § 18081(a)(1); *see also id.* § 18041(a)(1) (directing HHS to "issue regulations setting standards for meeting the requirements under this title").

The phrase "lawfully present" had a significant history in federal law when Congress incorporated it into the ACA in 2010. Congress used that phrase in PRWORA in 1996, distinguishing between "qualified alien[s]" and "alien[s] who [are] lawfully present" for purposes of Social Security benefits. *See* 8 U.S.C. § 1611(a), (b)(2). Congress defined the former strictly, *see id.* § 1641, but left the latter to be

12

defined by the Attorney General (and now the Secretary of Homeland Security), *see id.* § 1611(b)(2).  Promptly after PRWORA's enactment, the Executive Branch promulgated a regulation defining "lawfully present" noncitizens under § 1611(b)(2) to include those "in deferred action status."  61 Fed. Reg. at 47,040 (explaining such persons fall within that term because they "remain in the United States under a Presidential or administrative policy that permits them to do so").  Far from overruling this definition, when Congress subsequently amended PRWORA, it expanded the Executive Branch's discretion to deem noncitizens lawfully present.  *See* 8 U.S.C. § 1611(b)(3)-(4).  DHS later reinforced this understanding, determining that a deferred-action period is a "period of stay authorized by the Attorney General," under 8 U.S.C. § 1182(a)(9)(B)(ii), during which a noncitizen does not accrue unlawful presence.  *See* 87 Fed. Reg. at 53,208 & n.203 (citing 2002 actions).  Accordingly, for over three decades, it has been clear that deferred-action recipients are "lawfully present" for certain purposes, including receiving some federal benefits, even though they lack an immigration status protecting them from removal.

**B.**  Consistent with this longstanding understanding, when HHS first defined "lawfully present" under the ACA in 2010, it included not only "qualified alien[s]" as defined by PRWORA, but also "[a]liens currently in deferred action status."  75 Fed. Reg. at 45,030.  When DACA was originally created in 2012, HHS declined to put DACA recipients on the same footing as other deferred-action recipients under the ACA, instead specifically excluding them from ACA exchanges.  *See* 77 Fed. Reg. at

13

52,615.  That choice was not rooted in any view that DACA recipients could not be considered "lawfully present" within the ACA's meaning, but rather on HHS's then-held view that it "would not be consistent with the reasons offered for adopting the DACA process to extend [ACA] health insurance subsidies … to these individuals." *Id.*

In the challenged rule, HHS changed its policy, deciding to align all deferred-action recipients for purposes of exchange eligibility after the COVID pandemic and DHS's 2022 promulgation of a DACA regulation.  In that regulation, DHS explained that, "while there is no express definition of 'lawfully present' or 'unlawfully present' for all purposes, Congress clearly authorized the [DHS] Secretary to determine who is 'lawfully present' for certain purposes" under PRWORA.  87 Fed Reg. at 53,209.  HHS "determined that changing its own definitions of 'lawfully present' … is consistent with DHS' explanation" in its DACA regulation, and better "effectuate[s] congressional intent in the ACA."  89 Fed. Reg. at 39,395.  HHS's decision to treat all deferred-action recipients as eligible to enroll in ACA health-insurance plans thus simply accords with the longstanding recognition that such noncitizens may be considered "lawfully present" for federal-benefits-related purposes, even though they are not "lawfully in the United States for all purposes."  87 Fed Reg. at 53,209 (explaining "'lawful presence' is a term of art, and very different from 'lawful status'"); *see* 89 Fed. Reg. at 39,395; *see also Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (recognizing "unlawful presence and unlawful status are distinct concepts in the argot

14

of immigration specialists"). That understanding existed when Congress enacted the relevant ACA language, and Congress has declined to disturb it over almost three decades. *See, e.g.*, *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) (presuming "Congress is aware of existing law when it passes legislation" (quotation marks omitted)).

Indeed, plaintiffs' own interpretations of similar state-law terms highlight that considering noncitizens with deferred action "lawfully present" is reasonable. Kansas, for instance, bars issuance of driver's licenses to those "[w]hose presence in the United States is in violation of federal immigration laws," Kan. Stat. Ann. § 8-237(i), yet considers an applicant "lawfully present in the United States" if he "has approved deferred action status," *id.* § 8-240(b)(2)(H). Indiana and South Dakota equate "lawful status" with having "approved deferred action status." Ind. Code §§ 9-13-2-92.3(a)(2)(G), 9-24-11-5(c)(4); S.D. Stat. § 32-12-1.1(7). Other States restrict license issuance to persons without "authoriz[ation]" to be in the United States, *see, e.g.*, Mont. Code. Ann. § 61-5-105(10), or who are "not lawfully present," Idaho Code § 49-303(14). Yet the States represented below that they issue licenses to DACA recipients. *See* R.Doc. 35, at 17.

**C.** The district court erred in suggesting that because DACA is only a "reprieve" from removal, and DACA recipients "lack lawful immigration status," they must be "not lawfully present." Op. 11-13. The district court rested this view on the profoundly mistaken belief that it reflects "the law of the land before the [f]inal

15

[r]ule." Op. 13. For almost three decades and against repeated congressional amendment of PRWORA and the ACA, "lawfully present" has been understood as a statutory term of art encompassing noncitizens subject to removal but with a grant of deferred action. *See supra* pp.1-3, 12-15. Indeed, DACA recipients specifically have always been considered "lawfully present" and thus eligible for Social Security benefits under PRWORA. *See* 87 Fed. Reg. at 53,208. The final rule aligns the treatment of DACA recipients with the long-time understanding of lawful presence and treats all deferred-action recipients similarly for purposes of exchange eligibility.

Next, the district court incorrectly suggested that PRWORA bars treatment of DACA recipients as "lawfully present." *See* Op. 14. The court stated that Congress established "categories of those who are qualified aliens in 8 U.S.C. § 1611(b), and nowhere does it state deferred action aliens are qualified aliens." *Id.* But PRWORA's separate descriptions of "qualified alien[s]" and "alien[s] who [are] lawfully present" reflects Congress's view that the latter category is broader than the former. *See* 8 U.S.C. § 1611(a), (b)(2). Thus, treating DACA recipients as "lawfully present," even though they are not "qualified aliens," is fully consistent with PRWORA.

Nor is the final rule incompatible with PRWORA's general limitation of "Federal public benefits" to "qualified aliens," "[n]otwithstanding any other provision of law." 8 U.S.C. § 1611(a). Congress later made a more specific, and broader, eligibility decision in the ACA by limiting QHP-enrollment eligibility not just to "qualified aliens" but rather to noncitizens "lawfully present in the United States." *See*

16

42 U.S.C. § 18032(f)(3). "It is a commonplace of statutory construction that the specific governs the general." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) (brackets omitted) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). While often true where "a general … prohibition is contradicted by a specific …permission," *RadLAX*, 566 U.S. at 645, that rule also governs construction of a general prohibition and a more specific prohibition, *cf. id.* (addressing statutes "in which a general authorization and a more limited, specific authorization exist side-by-side"). Interpreting the "'general enactment … to affect only such cases within its general language as are not within the provisions of the particular enactment'" avoids "the superfluity of a specific provision that is swallowed by the general one." *Id.* at 645-46 (quoting *United States v. Chase*, 135 U.S. 255, 260 (1890)). The district court should have given effect to both provisions by construing the ACA's more specific provision as an exception to PRWORA's more general one, or the more recent ACA as modifying the older PRWORA, *cf. Dorsey v. United States*, 567 U.S. 260, 274 (2012) ("Congress … remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, [or] to modify the earlier statute, … either expressly or by implication."). Either way, the ACA's particular criteria control.

Finally, the district court erred in evaluating only whether plaintiffs have "a fair chance of prevailing on the merits." Op. 13. Such a determination is inadequate to

17

support injunctive relief under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which requires "likely" success. *Id.* at 20. To the extent this Court has suggested a lower "fair chance" standard sometimes applies, it has recognized it does not where, as here, "a party seeks to enjoin a government regulation that is based on presumptively reasoned democratic processes." *Firearms Regulatory Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 517 (8th Cir. 2024) (quotation marks omitted).

## III. THE EQUITABLE FACTORS OVERWHELMINGLY FAVOR A STAY

### A. A Stay Will Prevent Irreparable Harm To Individuals Who Reasonably Relied On The Rule And To The Public Interest

The injunction will profoundly harm thousands of individuals who have already acted in good-faith reliance on the rule. Since November 1, DACA recipients within the affected States have been enrolling in insurance plans on the exchanges. R.Doc. 119-1, at 7 (detailing over 2,600 enrollments within 16 plaintiff States).[4] Many enrollees have health-insurance plans set to go into effect in less than three weeks, on January 1. *See id.* at 7-8. Under the injunction, HHS will be forced to cancel, on short notice, health-insurance policies for these thousands of individuals, who did nothing wrong. *Id.* Even worse, the injunction compels the abrupt termination on January 1 of over 800 health-insurance policies that went into effect December 1. *See id.* at 8-9. Cancellations and terminations will begin after December 22, 2024. *See id.* at 6-9.

---

[4] HHS operates exchanges within, and provided data regarding, the 16 plaintiff States for which it operates an exchange; these numbers do not reflect enrollments within the three SBE plaintiff States.

Appellate Case: 24-3521    Page: 20    Date Filed: 12/13/2024 Entry ID: 5466501

Individuals relying on these plans may have medical treatments scheduled to begin or continue in the coming weeks, and—absent a stay—will now find themselves without coverage. The district court failed to consider any such harms, despite being repeatedly advised that DACA recipients would begin enrolling November 1. *E.g.*, R.Doc. 61, at 5; R.Doc. 107, at 7.

Nor is the injunction's fallout limited to individuals who already relied on the rule to obtain or sign up for health insurance. Approximately 44,000 previously uninsured DACA recipients live in the plaintiff States, *see* R.Doc. 27, at 8-9, ¶ 45; 89 Fed. Reg. at 39,395, many of whom likely would have obtained insurance in the usual mid-December surge in enrollment, *see* R.Doc. 119-1, at 4-5. Precluding such enrollment harms both DACA recipients and their communities. *See* 89 Fed. Reg. at 39,429; R.Doc. 69 (States' Amicus Br.), at 4-8. Moreover, the injunction threatens not only DACA recipients' access to health insurance, but also their children's—who are likely U.S.-born citizens—given that children are more likely to be insured when their parents are. *See* 89 Fed. Reg. at 39,402. And by forcing HHS to make an abrupt and unprecedented change to its enrollment platform used by millions of people during the open-enrollment period, the injunction "creates a risk of system downtime that could deter [all] consumers from enrolling in QHPs." R.Doc. 119-1, at 8.

Appellate Case: 24-3521    Page: 21    Date Filed: 12/13/2024 Entry ID: 5466501

## B. The Injunction Is Unnecessary To Prevent Irreparable Harm To Plaintiffs, Whose Own Delay Supports A Stay

As demonstrated above, plaintiffs have not shown that the final rule injures them, and neither would a stay. Staying the injunction is highly unlikely to prompt any DACA recipient who otherwise would have left either the United States or the plaintiff States to remain. *See supra* p.10. And even on plaintiffs' unsupported view to the contrary, the social-service costs invoked fail to account for emergency-care savings and DACA recipients' tax payments. *See* States' Amicus Brief 7-12; R.Doc.61, at 14 n.7; 87 Fed. Reg. 53,152, 53,154 (2022) (estimating $3.1 billion DACA-related State and local tax payments annually). Thus, even if plaintiffs could establish standing based on minimal indirect costs, any such harm has little weight in the equitable balance.

The district court cited administrative costs for the three plaintiff States that run their own exchanges. Op. 15. The final rule recognized that SBEs would need to update their platforms to allow DACA recipients to enroll in plans. *See* 89 Fed. Reg. at 39,423. But Idaho, Kentucky, and Virginia necessarily completed such updates before open enrollment began November 1. Thus, the preliminary injunction does not protect against these costs. *Cf. Ng v. Board of Regents of Univ. of Minn.*, 64 F.4th 992, 997-999 (8th Cir. 2023) (vacating preliminary injunction where asserted harm already occurred). Indeed, absent a stay, unwinding any changes the SBEs already made could potentially increase plaintiffs' costs.

20

The final rule also estimated that SBEs would spend approximately 10 minutes (estimated $8.22 time-cost) per new-enrollee application. 89 Fed. Reg. at 39,424. Plaintiffs have not shown that performing these functions will require them to hire additional staff or otherwise increase expenditures for the approximately 0.53-0.80% increase in enrollment, *see* 89 Fed. Reg. at 39,428 (estimating 27% of DACA recipients are uninsured); R.Doc. 27, at 8-9, ¶ 45 (DACA-recipient numbers); CMS, *Health Insurance Marketplaces 2024 Open Enrollment Report* 5-6, https://perma.cc/FZQ6-X5Y2 (enrollees per State), or that any costs would exceed the additional revenue generated by new enrollees, *see, e.g.*, Ky. Rev. Stat. § 304.17B-021(1).

Finally, plaintiffs' own litigation choices counsel in favor of staying the late-breaking injunction. The rule was proposed in April 2023 and issued on May 8, 2024, making no secret of DACA recipients' ability to start enrolling for health insurance on November 1, 2024. Nonetheless, plaintiffs waited three months to file suit, and then delayed three more weeks before seeking a preliminary injunction, leaving the district court and parties only two months before individuals began enrolling in health-insurance plans. *See* R.Doc. 1; R.Doc. 35. Plaintiffs' decision to substantially run down the clock to the open-enrollment date, to the detriment of thousands of third parties, counsels against equitable relief. *See, e.g.*, *Adventist Health System/SunBelt, Inc. v. HHS*, 17 F.4th 793, 805 (8th Cir. 2021) ("'[A] long delay by plaintiff after learning of

21

the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.'" (alterations omitted)).

## CONCLUSION

The district court's order should be stayed pending appeal. The government respectfully requests relief by December 20, 2024.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*

CATHERINE M.A. CARROLL
  *Deputy Assistant Attorney General*

MELISSA N. PATTERSON

 *s/ Leif Overvold*

LEIF OVERVOLD
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7226*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *leif.overvold2@usdoj.gov*

December 2024

22

# CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,189 words. This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the motion has been scanned for viruses, and the motion is virus free.

*s/ Leif Overvold*
Leif Overvold

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2024, I electronically filed the foregoing

motion with the Clerk of the Court for the United States Court of Appeals for the

Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished

by the appellate CM/ECF system.


*s/ Leif Overvold*
Leif Overvold

**ADDENDUM**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

State of Kansas et al.,

                      Plaintiffs,

vs.                                     Case No. 1:24-cv-00150

United States of America et al,

                      Defendants.

---

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND STAY,**
**FINDING AS MOOT MOTION FOR TEMPORARY RESTRAINING ORDER,**
**AND DENYING MOTIONS TO DISMISS**

---

[¶ 1]    THIS MATTER comes before the Court upon a Motion for Preliminary Injunction and Motion for Stay filed by the Plaintiffs[1] on August 30, 2024. Doc. Nos. 35, 63. The United States of America and the Centers for Medicare & Medicaid Services ("Defendants") filed a Response on September 25, 2024. Doc. No. 61. Plaintiffs filed their Reply on October 9, 2024. Doc. No. 81. Amicus briefs have also been filed in this matter. Nineteen states[2] and the District of Columbia joined the Defendants in opposition to the Motions. Doc. No. 69. An additional amicus brief was filed by various organizations[3] in support of Defendants. A hearing on the motion was held on October 15, 2024. Doc. No. 84. Post-hearing briefing was ordered and completed on November

---

[1] The Plaintiffs are nineteen States ("Plaintiff States"): Ohio, Idaho, Nebraska, South Carolina, Kansas, Alabama, Virginia, Tennessee, Indiana, Missouri, Montana, North Dakota, South Dakota, Iowa, New Hampshire, Kentucky, Texas, Florida, and Arkansas.

[2] The Defendant States include New Jersey, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington.

[3] The Defendant Organizations include the American Cancer Society Cancer Action Network, American Lung Association, Epilepsy Foundation of American Leukemia & Lymphoma Society, and the Muscular Dystrophy Association.

- 1 -

12, 2024. Doc. Nos. 87, 101, 103, 111. Defendants filed a brief in response to the supplemental information on November 14, 2024.

[¶ 2]    While waiting for supplemental briefing, Plaintiffs filed a Motion for Temporary Restraining Order on November 1, 2024. Doc. No. 105. Defendants filed a Response on November 1, 2024. Doc. No. 107. Defendants then filed (1) a Motion to Dismiss for Lack of Jurisdiction, (2) a Motion to Dismiss for Failure to State a Claim, and (3) a Motion to Dismiss or Transfer Case for Improper Venue on November 4, 2024. Doc. No. 108. Plaintiffs filed a Response to all Motions on November 25, 2024. Doc. No. 114. The deadline for Defendants to file a Reply has passed. For the reasons set forth below, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction and Stay, finds as **MOOT** Plaintiffs' Motion for Temporary Restraining Order, and **DENIES** Defendants' Motions to Dismiss.

## INTRODUCTION

[¶ 3]    This case involves a change to the Deferred Action for Childhood Arrivals ("DACA") program from a final rule promulgated by the Centers for Medicare & Medicaid Services ("CMS"). See 89 Fed. Reg. 39,392-01 (May 8, 2024) ("Final Rule"). The Final Rule revised CMS's definition of "lawfully present" to allow DACA recipients to enroll in health insurance plans through the Patient Protection and Affordable Care Act ("ACA") exchanges. The primary points of contention in this case are (1) whether Plaintiffs have standing, (2) whether the change to include DACA recipients as lawfully present is contrary to congressional intent and (3) whether CMS acted within its authority under the Administrative Procedure Act ("APA").

## BACKGROUND

[¶ 4]    In 2010, Congress enacted the ACA requiring each state to create an exchange or platform to purchase health insurance and make qualified health plans ("QHPs") available to individuals.

<u>King v. Burwell</u>, 576 U.S. 473, 478–79 (2015); 42 U.S.C. 18031(d)(2)(A). Whether states create their own exchanges or allow the federal government to operate them is up to their discretion. 42 U.S.C. §§ 18031(b)(1), 18041(c). However, the ACA only allows qualified individuals to enroll in QHPs. 42 U.S.C. §§ 18021(a), 18032(a)(1). To qualify, the individual must reside in the state operating the exchange and be a citizen or national of the United States or a noncitizen that is lawfully present in the United States. 42 U.S.C. §§ 18032(a)(1), (f)(3). The ACA does not define lawfully present. <u>See</u> <u>id.</u> at 18032(f)(3).

[¶ 5]   In 2012, the Secretary of Homeland Security issued a memorandum establishing the DACA program. Mem. from Sec'y Napolitano (June 15, 2012), https://perma.cc/PRR8-PBT7. The memorandum set forth how the Department of Homeland Security ("DHS") would exercise its prosecutorial discretion with certain "low priority cases." <u>Id.</u> at 1. The memorandum allowed noncitizens to apply for a two-year renewable period of deferred action if the individual: (1) came to the United States under the age of sixteen, (2) had continuously resided in the United States for at least five years prior to the date of the memorandum and present in the United States on the date of the memorandum, (3) were in school, had graduated high school, earned a GED, or were honorably discharged as veterans, (4) were not convicted of a felony offense, significant misdemeanor offense, multiple misdemeanor offenses, or otherwise posed a threat to national security and public safety, and (5) not above the age of thirty. <u>Id.</u> CMS amended its definition of "lawfully present" at this time to specifically exclude DACA recipients. <u>See</u> 77 Fed. Reg. 18314.

[¶ 6]   In April 2023, CMS issued Notice of Proposed Rulemaking that would, in relevant part, allow DACA recipients and employment-authorized aliens to be considered lawfully present for purposes of the ACA. <u>See</u> 88 Fed. Reg. 25313; 89 Fed. Reg. 39392.[4] The Final Rule was published

---

[4] The Summary of the rule reads:

on May 8, 2024, and estimated 147,000 DACA recipients were expected to enroll in QHPs through an exchange because of the change. 89 Fed. Reg. at 39393–94. The Final Rule also adds individuals granted employment authorization numbers under 8 C.F.R. Section 274a.12(c) into the definition of lawfully present for ACA eligibility. Id. at 39408. This addition expands eligible categories for coverage from seven[5] to thirty-six. Id. The Final Rule became effective on November 1, 2024. Id. at 39393.

[¶ 7]     Three Plaintiff States privy to this lawsuit have elected to create a state-based exchange ("SBE") to handle QHP enrollment: Kentucky, Idaho, and Virginia. These states, and others who run their own SBE, will incur two separate costs. The first is $184,918 to develop and code changes to each state's exchange eligibility system. 89 Fed. Reg. at 39423, 26 table 2. The second is $624,142 in state application processing charges to assist those impacted by the Final Rule. Id. at 39424, 26; see also Doc. No. 35-2, ¶¶ 20–22. This brings the total cost for the SBE Plaintiffs to $809,060. The remaining Plaintiffs argue they suffer injury due to extra state expenses associated with processing more DACA recipients.

---

This final rule makes several clarifications and updates the definitions currently used to determine whether a consumer is eligible to enroll in a Qualified Health Plan (QHP) through an Exchange; a Basic Health Program (BHP), in States that elect to operate a BHP; and for Medicaid and Children's Health Insurance Programs (CHIPs). **Specifically, Deferred Action for Childhood Arrivals (DACA) recipients and certain other noncitizens will be included in the definitions of "lawfully present" that are used to determine eligibility to enroll in a QHP through an Exchange**, for Advance Payments of the Premium Tax Credit (APTC) and Cost-Sharing Reductions (CSRs), or for a BHP. . . . **These regulations are effective on November 1, 2024.**

89 Fed Reg. 39392 (emphasis added).

[5] The old version of 8 C.F.R. Section 152.2(4)(iii) included only seven categories under 8 C.F.R. Sections 274a.12(c)(9), (10), (16), (18), (20), (22), or (24).

## JURISDICTION

[¶ 8]    The Defendants argue venue is improper here because North Dakota does not have standing independent of the other Plaintiffs and therefore, this action should be dismissed or transferred to another jurisdiction. The Plaintiffs argue in their opening brief that the States have standing under the "special solicitude" standard under <u>Massachusetts v. EPA</u>, 549 U.S. 497, 520 (2007). In the alternative, Plaintiffs argue North Dakota has standing due to the pocketbook costs associated with the Final Rule and, therefore, venue is proper.

[¶ 9]    When the United States or its agencies are a defendant, venue is proper in any judicial district in which the plaintiff resides if no real property is involved in the action. 28 U.S.C. § 1391(e)(1)(c). It is the Plaintiffs' burden to prove this district is a proper venue. <u>Rare Breed Triggers, LLC v. Garland</u>, 639 F. Supp. 3d 903, 907 (D.N.D. 2022) (noting that plaintiffs bear the burden of demonstrating the chosen district is a proper venue when the defense raises an objection). Plaintiffs allege in the complaint that North Dakota's residence establishes venue. Doc. No. 35, ¶ 22. For venue to be proper here, North Dakota must have standing independent of the other Plaintiffs. 28 U.S.C. § 1406(a) (where venue is improper, the Court may transfer to another venue where the claims could have been brought); <u>see also</u> <u>Kansas v. Garland</u>, No. 2:24CV00088 JM, 2024 WL 2384611 at *1 (E.D. Ark. May 23, 2024) ("Because no plaintiff with standing resides in this district, venue is improper.").

### I.    Procedural vs. Substantive Right under <u>Massachusetts v. EPA</u>

[¶ 10]    The Court must first address whether North Dakota and the other Plaintiffs have "special solicitude" and thus do not need to meet all the traditional requirements of standing. <u>Massachusetts v. EPA</u>, 549 U.S. at 520. The Eighth Circuit has ruled <u>Massachusetts v. EPA</u> "did not eliminate[] the basic requirements for standing just because a state is the plaintiff. <u>Missouri v. Yellen</u>, 39

- 5 -

F.4th 1063, 1070 n.7 (8th Cir. 2022); accord La. ex rel. La. Dep't of Wildlife & Fisheries v. NOAA, 70 F.4th 872, 882 (5th Cir. 2023). Therefore, Plaintiffs must meet all the traditional requirements for standing.[6]

## II.    North Dakota's Standing

[¶ 11]  North Dakota alleges it suffers injury because (1) the DACA change provides a valuable public benefit that will foreseeably encourage alien beneficiaries who are here unlawfully to remain in the United States, (2) it must educate DACA recipient children, and (3) DACA recipients consume costly public benefits.

[¶ 12]  Standing requires the party to show they have, or will suffer, an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013). The plaintiff "bears the burden of establishing standing as of the time [s]he brought th[e] lawsuit and maintaining it thereafter." Carney v. Adams, 592 U.S. 53, 59, (2020). She must support each element of standing "with the manner and degree of evidence required at the successive stages of

---

[6] Also worthy to note is Justice Gorsuch's concurrence in United States v. Texas, which states:

> if an exercise of coercive power matters so much to the Article III standing inquiry, how to explain decisions like Massachusetts v. EPA? There the court held that Massachusetts had standing to challenge the federal government's decision not to regulate greenhouse gas emissions from new motor vehicles. And what could be less coercive than a decision not to regulate? In Massachusetts v. EPA, the Court chose to overlook this difficulty in part because it thought the State's claim of standing deserved "special solicitude." I have doubts about that move. Before Massachusetts v. EPA, the notion that States enjoy relaxed standing rules 'ha[d] no basis in our jurisprudence.' Nor has 'special solicitude' played a meaningful role in this Court's decisions in the years since. **Even so, it's hard not to wonder why the Court says nothing about 'special solicitude' in this case. And it's hard not to think, too, that lower courts should just leave that idea on the shelf in future ones.**

599 U.S. 670, 688–89 (2023) (Gorsuch, J., concurring) (cleaned up) (emphasis added).

the litigation." <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992). At the preliminary injunction stage, then, the plaintiff must make a "clear showing" that she is "likely" to establish each element of standing. <u>See</u> <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008).

[¶ 13]   The Supreme Court in <u>United States v. Texas</u> has said:

> [F]ederal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer. To be sure, States sometimes have standing to sue the United States or an executive agency or officer. But in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated.

599 U.S. 670, 680 n.3 (2023); <u>accord</u> <u>Garland</u>, 2024 WL 2384611 at *2 (citing the same). The ACA requires states to create an "exchange" which "shall make available qualified health plans to qualified individuals." North Dakota elected to let the federal government run its exchange, so it is classified as a federally-facilitated exchange ("FFE"). <u>See</u>, *State-based Exchanges*, Centers for Medicare and Medicaid Services (Aug. 28, 2024), https://www.cms.gov/cciio/resources/fact-sheets-and-faqs/state-marketplaces . The Final Rule contemplates the federal government will bear the costs associated with the expansion for the states that have not elected to run its own SBE. <u>See</u> 89 Fed. Reg. at 39423–26 (discussing the financial impact of the Final Rule and noting "this change applies to the 18 State Exchanges not on the Federal platform"). The Final Rule does not directly impact FFEs.

[¶ 14]   As an FFE, North Dakota does not suffer a direct injury from the Final Rule. <u>See</u> <u>id.</u> at 39424–46 (providing the economic impact of the Final Rule on FFE, SBE, and SBE-FP states). Thus, North Dakota's claim for standing is more attenuated. While more difficult, it is not impossible for North Dakota to prove standing.

[¶ 15]  In recent years, states challenging federal immigration policies have proven injury in fact by demonstrating (1) an additional alien presence in that state because of the challenged action, (2) which results in additional costs paid from the state's treasury. <u>Texas v. Mayorkas</u>, No. 6:23-CV-00001, 2024 WL 4355197, at *4 (S.D. Tex. Sept. 30, 2024). The Court adopts this approach. The additional alien presence is easily met as the Final Rule contemplates an additional 147,000 aliens will be eligible to receive benefits, effectively increasing the population. As for additional costs, the Supreme Court has stated "[i]f a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 425 (2021). North Dakota has submitted evidence it costs $584.74 to issue driver licenses and identification cards to the 126 identified DACA recipients in the State. Doc. No. 103, p. 7. North Dakota also claims, while it cannot provide an exact figure, it can confirm at least one DACA recipient or dependent is enrolled in the state's public education system, incurring a cost of $14,345.87 per pupil on the State. Doc. No. 111. This amounts to almost $15,000 in monetary costs. At least one of the 147,000 individuals eligible to enroll in a QHP will reside in North Dakota, thus causing further monetary injury.

[¶ 16]  The Court notes North Dakota's theory on standing rests upon the actions of third parties, that is the actions of the 147,000 newly eligible aliens, which makes standing more difficult to prove than when the defendant acts directly on the plaintiff. <u>Lujan</u>, 504 U.S. at 561–562. However, standing can still exist if there is evidence third parties will likely react in predictable ways to the defendant's challenged conduct. <u>Dep't of Comm. v. New York</u>, 588 U.S. 752, 768 (2019). Certainty is not required so long as the likely reaction "does not rest on mere speculation." <u>Id.</u> A future injury can also establish standing so long as it is "certainly impending, or there is a

- 8 -

substantial risk that the harm will occur." <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 157 (2014).

[¶ 17]  In this case, Plaintiff States claim with DACA becoming available to roughly 147,000 people, it will cause them harm as the allure of health care will incentivize those who plan to leave the Plaintiff States to remain. The Defendants argue the Plaintiffs have offered no proof that any of the 147,000 DACA recipients would leave the respective Plaintiff States but for the Final Rule. However, the Supreme Court allows reliance on third-party incentives as part of proof showing likely behavior. <u>Dep't of Comm. v. New York</u>, 588 U.S. at 768 ("Respondents' theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties."); <u>see also</u> <u>Davis v. Fed. Election Comm'n</u>, 554 U.S. 724, 735 (2008) (concluding a significant risk of future injury was sufficient to establish standing, not whether injury is realized). These cases show if there is proof allowing a fair prediction of third-party responses, proof showing the challenged conduct produced the harm-causing choice is not required. Proof of predictable reactions can also include common-sense inferences. <u>See</u> <u>Affiliated Ute Citizens v. United States</u>, 406 U.S. 128, 155 (1972) ("[R]easonable inference may be drawn [by] the District Court, as the trier of fact.").

[¶ 18]  The Court concludes, through a common-sense inference, that the powerful incentive of health care will encourage aliens who may otherwise vacate the Plaintiff States to remain. <u>See</u> 8 U.S.C. § 1601(5) (noting the availability of public benefits is an incentive for illegal immigration that Congress has a compelling interest to remove). Their continued presence creates a substantial risk North Dakota will suffer monetary harm via issuing licenses and providing education. This is

sufficient to meet the injury in fact requirement.[7] The remaining standing elements are easily met.

But for the Final Rule issued by the Defendants, North Dakota would not have to incur additional

costs. Lastly, the Court can redress this harm by staying the Final Rule, preventing further injury.

Therefore, the Court finds North Dakota has standing and therefore, venue is proper.

## **DISCUSSION**

### I.    **Preliminary Injunction**

[¶ 19]  Plaintiffs seek to exercise their right under the APA to seek a preliminary injunction. The

APA provides:

> When an agency finds that justice so requires, it may postpone the effective date of
> action taken by it, pending judicial review. On such conditions as may be required
> and to the extent necessary to prevent irreparable injury, the reviewing court,
> including the court to which a case may be taken on appeal from or on application
> for certiorari or other writ to a reviewing court, may issue all necessary and
> appropriate process to postpone the effective date of an agency action or to preserve
> status or rights pending conclusion of the review proceedings.

5 U.S.C.A. § 705.

[¶ 20]  A plaintiff seeking a preliminary injunction must establish four factors showing such relief

is warranted: (1) success on the merits; (2) they are likely to suffer irreparable harm in the absence

of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the

public interest. Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms &

Explosives, 78 F.4th 1011, 1016 (8th Cir. 2023). When the government is the opposing party, the

balance of harms factor and the public interest factor merge. Gen. Motors Corp. v. Harry Brown's,

LLC, 563 F.3d 312, 316 (8th Cir. 2009) "A district court has broad discretion when ruling on

---

[7] This type of "indirect monetary harm" was sufficient for the Supreme Court before and this
discrepancy was referenced in a concurrence by Justice Gorsuch. See Texas v. United States, 599
U.S. at 688 (noting one dollar's worth of harm was sufficient for standing and points out how the
Supreme Court allowed other states to challenge Executive Branch policies that indirectly caused
them monetary harm in the past and ponders why the Supreme Court forbids the same actions
now).

requests for preliminary injunctions." <u>Entergy, Arkansas, Inc.. v. Nebraska</u>, 210 F.3d 887, 898 (8th Cir. 2000).

[¶ 21]   When deciding whether to grant a preliminary injunction, courts ask "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." <u>Nebraska v. Biden</u>, 52 F.4th 1044, 1046 (8th Cir. 2022) (per curiam) (quoting <u>Glenwood Bridge, Inc. v. City of Minneapolis</u>, 940 F.2d 367, 370 (8th Cir. 1991)).

[¶ 22]   The movant bears the burden of demonstrating the preliminary injunction is warranted because a preliminary injunction is an "extraordinary remedy never awarded as of right." <u>Progressive Techs., Inc. v. Chaffin Holdings, Inc.</u>, 33 F.4th 481, 485 (8th Cir. 2022) (quoting <u>Winter</u>, 555 U.S. at 24). Likelihood of success on the merits is the most important factor, <u>Craig v. Simon</u>, 980 F.3d 614, 617 (8th Cir. 2020) (per curiam), and requires a movant to demonstrate at least a "fair chance of prevailing." <u>Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs</u>, 826 F.3d 1030, 1041 (8th Cir. 2016). Regardless, the Court is required to consider all the factors. <u>See</u> <u>Home Instead, Inc. v. Florance</u>, 721 F.3d 494, 500 (8th Cir. 2013).

### A.  Success on the Merits

[¶ 23]   Plaintiffs argue they are likely to succeed on the merits because the Final Rule is contrary to law or in excess of statutory authority and the Final Rule is arbitrary and capricious. Specifically, Plaintiffs claim the determination of DACA recipients as lawfully present is contrary to law because the "action" that is deferred by the DACA program is an enforcement action, namely deportation of the recipients' unlawful presence. <u>See</u> 8 C.F.R. § 236.22(b)(4) (limiting DACA availability to aliens who lack lawful immigration status). The Plaintiffs cite caselaw from the Eleventh Circuit that says "DACA recipients are simply given a reprieve from protentional

removal; that does not mean they are in any way 'lawfully present' under the [Immigration and Nationality Act]."  Estrada v. Becker, 917 F.3d 1298, 1305 (11th Cir. 2019) (citation omitted). Additionally, they cite a Fifth Circuit case stating:

> DACA creates a new class of otherwise removable aliens who may obtain lawful presence, work authorization, and associated benefits. Congress determined which aliens can receive these benefits, and it did not include DACA recipients among them. We agree with the district court's reasoning and its conclusions that the DACA Memorandum contravenes comprehensive statutory schemes for removal, allocation of lawful presence, and allocation of work authorization.

Texas v. United States, 50 F.4th 498, 526 (5th Cir. 2022).[8] Plaintiffs also argue the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA") prohibits non-qualified aliens from receiving any federal public benefit. 8 U.S.C. § 1611(a). Lastly, they argue Congress has not included aliens granted deferred action within the definition of "qualified alien," 8 U.S.C. § 1641, nor do DACA recipients fall within an exception to the prohibition on public benefits. See 8 U.S.C. § 1611(b)(1).

[¶ 24]  The Defendants argue the definition of lawfully present is consistent with the ACA because, while the ACA itself does not include a definition, there is other relevant congressional history that supports the Final Rule's definition. They also argue the definition is consistent with how many of the Plaintiff States interpret "similar terms" in state law. See Doc. No. 61, pp. 32–33 (citing statutory law from Kansas, Indiana, South Dakota, Montana, Idaho, Kentucky, Nebraska, Tennessee, Texas, and Virginia that allows aliens who are lawfully present, which includes DACA recipients, to apply for and receive driver's licenses).

---

[8]  The Fifth Circuit applied the then binding framework of Chevron, which has since been overturned. See Loper Bright Enterprises v. Raimondo, 144 S. Ct. 2244 (2024). The Court does not apply the Chevron framework here.

[¶ 25]  In weighing success on the merits, the Court does not decide whether the movant "will ultimately win"; rather, the movant "must simply show a 'fair chance of prevailing.'" <u>Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC</u>, 953 F.3d 1041, 1045 (8th Cir. 2020) (quoting <u>Planned Parenthood Minn., N.D., S.D. v. Rounds</u>, 530 F.3d 724, 732 (8th Cir. 2008) (en banc)). Whether a movant has shown a fair chance of prevailing does not mean the movant must "prove greater than fifty per cent likelihood that [it] will prevail on the merits." <u>Id.</u> (cleaned up) (quoting <u>Dataphase Sys., Inc. v. C L Sys., Inc.</u>, 640 F.2d 109, 113 (8th Cir. 1981)). Under circumstances where the movant has no chance of succeeding, an injunction will not issue. <u>Id.</u>

[¶ 26]  Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). An agency has acted in excess of statutory authority when it "has gone beyond what Congress has permitted it to do" either by assuming authority it does not have or by exercising the authority it does have in an impermissible way. <u>City of Arlington v. FCC</u>, 569 U.S. 290, 297 (2013). When the ACA was passed, Congress empowered agencies to define who may enroll in QHPs through an exchange by issuing "regulations setting standards" for establishing operating exchanges and establishing a program for determining whether a noncitizen applicant is lawfully present for purposes of exchange eligibility. 42 U.S.C. §§18032(f)(3), 18041(a)(1).

[¶ 27]  As it currently stands, the ACA does not allow federal healthcare subsidies or coverage for aliens who are unlawfully present in the United States. 42 U.S.C. §18032(f)(3); <u>see also</u> Doc. No. 61, p. 31 (Defendants concede the ACA does not define lawfully present.). As a result, the Court agrees with the Fifth and Eleventh Circuits. The law of the land before the Final Rule was that DACA recipients were not lawfully present, which was recognized by CMS. 77 Fed. Reg. 52614;

- 13 -

45 C.F.R. § 152.2.  Like the Fifth Circuit stated, it is for Congress to determine who qualifies for lawful presence status, not agencies. Congress stated in PRWORA that non-qualified aliens are prohibited from receiving any federal public benefit. The authority granted to CMS by the ACA is to ascertain whether an individual meets the requirements for lawful status. It by no means allows the agency to circumvent congressional authority and redefine the term "lawfully present." Congress has laid out the categories of those who are qualified aliens in 8 U.S.C. § 1611(b), and nowhere does it state deferred action aliens are qualified aliens. CMS only has authority to determine if aliens fit into one of those established categories, not create a new one.

[¶ 28]  For the above stated reasons, the Court finds the Plaintiff States have proven a fair chance of prevailing because CMS acted contrary to law by redefining who is a qualified alien, a determination that is to be left to Congress. This factor weighs in favor of granting a preliminary injunction. Because the Court has concluded Plaintiffs will likely succeed on the merits because CMS acted contrary to law, there is no need to analyze the arbitrary and capricious claim.

### B.  Irreparable Harm

[¶ 29]  Plaintiffs claim irreparable harm through the costly public benefits they must expend to adhere to the Final Rule. Defendants argue the costs are indirect, which the Supreme Court has stated is insufficient; the harm is not impending; the States do not consider the benefits DACA recipients bring; and the costs are self-inflicted.

[¶ 30]  "Irreparable harm" signifies harm for which "a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages. <u>Gen. Motors</u>, 563 F.3d at 319. "[A] party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." <u>Morehouse Enterprises, LLC</u>, 78 F.4th at 1017 (citing <u>Dakotans for Health v. Noem</u>, 52 F.4th 381, 392 (8th Cir. 2022)). The

plaintiffs must show the harm is not merely a possibility but is likely to occur absent preliminary injunctive relief. <u>Tumey v. Mycroft AI, Inc.</u>, 27 F.4th 657, 665 (8th Cir. 2022). "Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered." <u>Wildhawk Invs., LLC v. Brava I.P., LLC</u>, 27 F.4th 587, 597 (8th Cir. 2022) (citing <u>DISH Network Serv. L.L.C. v. Laducer</u>, 725 F.3d 877, 882 (8th Cir. 2013)).

[¶ 31]  Here, the Plaintiffs have alleged monetary harms, which do not appear to be recoverable as the Final Rule specifically contemplates the costs each state and the federal government must cover. <u>Foerderer v. TransUnion Corp</u>, No. 1:20-CV-188, 2021 WL 2667524, at *2 (D.N.D. Apr. 20, 2021), <u>report and recommendation adopted sub nom.</u> <u>Foerderer v. Experian Info. Sols., Inc.</u>, No. 1:20-CV-00188, 2021 WL 2669554 (D.N.D. May 5, 2021) (opining the plaintiff's injuries are compensable by monetary damages and cannot be considered an irreparable harm); <u>see</u> 89 Fed. Reg. at 39423–24 (providing the cost of the Final Rule on the 18 SBE States will be 51% of the total approximate cost while the federal government provides the remaining 49% of funding). These costs are sufficient to establish irreparable harm.

[¶ 32]  Even if these costs were insufficient, allowing potential unlawful action would constitute irreparable harm. <u>See</u> <u>Shawnee Tribe v. Mnuchin</u>, 984 F.3d 95, 102 (D.C. Cir. 2021) (perpetuation of unlawful agency action is not in the public's best interest); <u>see also</u> <u>Maryland v. King</u>, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (When the government "is enjoined by a court from effectuating statutes enacted by the representatives of its people, it suffers a form of irreparable injury."). Plaintiffs here are faced with a choice: comply with what they believe to be an unlawful directive or lose federal government support to operate the costly exchanges required under the ACA. Other courts have found this type of "Hobson's choice" sufficient for irreparable harm. <u>See</u> <u>City of Albuquerque v. Barr</u>, 515 F. Supp. 3d 1163, 1175 (D.N.M. 2021) (collecting

cases from the Supreme Court, Ninth Circuit, and the Northern District of Illinois establishing the same). Therefore, the Plaintiffs have met the burden of proving irreparable harm.

### C. Balance of Equities and the Public Interest

[¶ 33]  Plaintiffs argue the balance of equities and public interest weigh in their favor because the agency action is unlawful. The Defendants argue the public interest is best served by increasing access to health care. Congress has declared the nation has a "compelling interest" in "remov[ing] the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C. § 1601(6). To not suspend the Final Rule would empower CMS to harm the compelling interest established by Congress. "There is generally no public interest in the perpetuation of unlawful agency action." League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016). Where a party has established a strong likelihood of success on the merits, it is a strong indication that a preliminary injunction would serve the public interest. Shawnee Tribe, 984 F.3d at 102.

[¶ 34]  Because the Court found the Plaintiffs have proven likelihood of success on the merits, this factor weighs in favor of granting the preliminary injunction.

### D. Conclusion

[¶ 35]  The preliminary injunction factors weigh in favor of issuing an injunction and a stay. Plaintiffs have shown likelihood of success on the merits because CMS acted contrary to law. Plaintiffs are likely to suffer irreparable harm from the expenses associated with carrying out the Final Rule and being faced with a Hobson's choice. This decision is in accord with what Fifth Circuit had previously decided. See Texas v. United States, 50 F.4th at 528-32. That reasoning is sound and should be embraced in the Eighth Circuit. Finally, the balance of equities and the public's interest are best served by enjoining the Final Rule. For those reasons, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction.

- 16 -

## II.    Motion To Stay

[¶ 36]   Plaintiffs also request a stay to the Final Rule. A stay is "an exercise of judicial discretion," and "[t]he propriety of its issue is dependent upon the circumstances of the particular case." Nken v. Holder, 556 U.S. 418, 433 (2009) (quoting Virginian Ry. Co. v. United States, 272 U.S. 658, 672-73 (1926)). The party requesting a stay bears the burden of showing the circumstances justify an exercise of that discretion. Id. at 433-34. The stay factors are: (1) whether the applicant is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. Id. at 434. There is substantial overlap between the preliminary injunction and stay factors "not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." Id.; see also Winter, 555 U.S. at 24.

[¶ 37]   Because the Court has found the preliminary injunction factors weigh in favor of the Plaintiffs, and because there is substantial overlap between the motion to stay and preliminary injunction factors, the Court finds Plaintiffs are entitled to a stay for the reasons articulated above. For those reasons, Plaintiffs' Motion to Stay is **GRANTED**.

## III.    Motion To Dismiss

[¶ 38]   Defendants filed a Motion to Dismiss on three grounds: lack of jurisdiction, failure to state a claim, and improper venue. Fed. R. Civ. P. 12(b)(1), (3), (6). The Federal Rules of Civil Procedure mandate the dismissal of a claim if there has been a failure to state a claim upon which relief can be granted. In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A plaintiff must show that success on

the merits is more than a "sheer possibility." Id. A complaint is sufficient if its "factual content . . .
allows the court to draw the reasonable inference that the defendant is liable for the misconduct
alleged." Id. The Court must accept all factual allegations as true, except for legal conclusions or
"formulaic recitation of the elements of a cause of action." Id. at 681.

[¶ 39]   The Court has addressed all these concerns through the standing and preliminary injunction
analysis. The Court has jurisdiction and venue is proper in North Dakota. Additionally, Plaintiffs
have shown likelihood of success on the merits, proving they have stated a claim upon which relief
can be granted. This conclusion is supported by evidence in the record offered by the Plaintiffs.
See Doc. Nos. 35-1, 35-2, 103, 103-1, 103-2, 111, 111-1. For these reasons, Defendants' Motions
to Dismiss are **DENIED**.

## **CONCLUSION**

[¶ 40]   The Court has reviewed the record, relevant caselaw, and arguments of the parties. For the
above stated reasons, Plaintiffs' Motions for Preliminary Injunction and Stay (Doc. No. 35) are
**GRANTED**. Defendants are preliminary enjoined from enforcing the Final Rule against the 19
Plaintiff States. As a result, Plaintiffs' Motion for Temporary Restraining Order (Doc. No. 105) is
**MOOT**. Defendants' Motions to Dismiss **(**Doc. No. 108) are **DENIED**.

[¶ 41]   **IT IS SO ORDERED.**

DATED December 9, 2024.

Daniel M. Traynor, District Judge
United States District Court

- 18 -