# DECLARATION OF GEORGE ESCOBAR, CHIEF OF PROGRAMS AND SERVICES FOR CASA, INC.

I, George Escobar, upon my personal knowledge, hereby submit this declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

1. I am the Chief of Programs and Services of CASA, Inc. (CASA). I have worked at CASA for fourteen years.

2. CASA is a non-profit membership organization headquartered in Langley Park, Maryland with offices in Maryland, Virginia, Pennsylvania, and Georgia.

3. Founded in 1985, CASA is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 150,000 lifetime members from across the United States. CASA's members are predominantly noncitizens with a variety of immigration statuses.

4. CASA's mission is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities. From our beginnings in a church basement, at CASA we have envisioned a future with diverse and thriving communities living free from discrimination and fear, working together with mutual respect to achieve human rights for all.

5. In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, Washington, D.C., Virginia, Pennsylvania, and Georgia. CASA also conducts campaigns to inform members of immigrant communities of their rights and assists individuals in applying for a variety of immigration benefits before the U.S. Citizenship and Immigration Services (USCIS) and other government benefits, including accessing health insurance through the Affordable Care Act

(ACA) marketplace.

6.  In my role as Chief of Programs and Services, I oversee CASA's portfolio of community-facing direct services, including its health, legal, and educational services; employment and workforce development programs; financial literacy and tax programs; and parent engagement programs.  An important part of my role is to understand the needs and experiences of our members so that I can work with my staff to design appropriate interventions to address those needs.  I therefore speak frequently with community members and receive feedback from my staff regarding CASA members' fears, concerns, and decisions.

7.  DACA recipients are a significant portion of our membership.  CASA is the number one organization in Maryland assisting DACA recipient filings.  Our membership includes at least 2,745 DACA recipients.

8.  CASA operates a public benefits outreach and enrollment program that assists community members to understand and enroll in various government assistance and health insurance programs.  CASA also offers a multilingual hotline to answer member questions and questions from the public.

9.  We also help to facilitate access to medical services.  For example, in Virginia, we partner with medical providers like Kaiser and Advanced Ophthalmology to offer free medical services, host vaccine clinics, work closely with local food pantries, and provide clothing vouchers of clothing for eligible members through Goodwill's Good Samaritan program.

10.  ACA enrollment is of great interest to our members in light of the financial and health security it would bring them.  The number one advocacy and service provision priority for our members has always been access to healthcare.  Our multilingual healthcare hotline receives about 3-4,000 calls per month, and 30-40% are regarding ACA enrollment.  In the last fiscal year

(July 2023 through June 2024), we provided assistance to 2,354 individuals navigating enrolling in an ACA Qualified Health Plan, Medicaid, or CHIP coverage option.

11. We routinely hear from our members when they experience issues accessing health care, so we have long been aware of the gap in access to affordable health insurance for DACA recipients who would otherwise qualify for Qualified Health Plans in the ACA marketplace. A common scenario we see is our DACA members achieving a modest increase in income, and then suddenly losing access to healthcare coverage under programs for low-income individuals like Kaiser Permanente's Community Health Access Program (CHAP), even though they still do not earn enough to afford private commercial insurance. This gap in coverage leads to financial instability, which is particularly harmful to DACA recipients who are finding financial and educational success and looking to improve their health and build a future. Access to the ACA marketplaces would enable these members to receive essential health services such as primary and preventative care and support their ability to lead stable and productive lives.

12. On May 8, 2024, the Centers for Medicare and Medicaid ("CMS") issued a Final Rule which clarified that the term "lawfully present" included DACA recipients as individuals with deferred action and work authorization, which would make them eligible to access ACA marketplaces. That rule went into effect on November 1, 2024, in time for Open Enrollment.

13. The Final Rule benefits all our members who are DACA recipients because they would be able to purchase insurance through the ACA marketplaces.

14. CASA members have spent extensive time, outside of their work and family obligations, to understand their financial, health, and long-term goals and determine if they qualify for and how to enroll in ACA marketplace plans. Because the Final Rule allows for stability of health insurance without needing to rely on employer-based care, CASA members

have made financial and personal decisions based on their well-researched and well-informed expectations to enroll in affordable coverage.

15. CASA, as an organization, also invested significant resources in preparation for the implementation of the Final Rule. We were excited that the Final Rule would improve CASA members' access to healthcare. Knowing the importance of the Final Rule to our community, CASA's staff already expended significant resources to educate our community and prepare to assist them applying for coverage: explaining the complex regulatory framework to our community, counseling members to help them decide whether and how to access plans in the ACA marketplaces. We created educational materials, drafted plans to expansively enroll members, and trained and prepared staff to help enroll members. The efforts CASA undertook earlier this year to inform and prepare our community have taken extensive staff time from two staff who help members sign up for care ("navigators") – about 15% of their Full Time Equivalent (FTE) – as well as from six of our organizers.

16. Legal challenges to the implementation of the Final Rule and subsequent court rulings on the validity of those claims in the midst of the ACA Open Enrollment period this past November and December have caused significant confusion and disruption for CASA and members of the immigrant community seeking to purchase health coverage, beyond individuals with DACA in the 19 impacted states. CASA has observed that news about the preliminary injunction effectively halted implementation of the Final Rule in the 19 impacted states, including Virginia, and has had a chilling effect that discourages otherwise qualified DACA applicants in the 31 non-plaintiff states from enrolling in the ACA marketplace. CASA has additionally observed that this ruling has further discouraged other lawfully present applicants, such as those with TPS and who are otherwise eligible, to apply through the ACA marketplaces.

As a result, CASA has had to divert additional resources to education, navigation, and legal support to assist individuals with DACA, as well as those with TPS and other lawfully present individuals, to understand their eligibility in light of the recent rulings. As a result, through the end of the Open Enrollment Period, CASA expects to divert an additional 25% of a CASA attorney's staff time, in addition to the equivalent of another Full Time Navigator's staff time, to prepare additional educational materials, conduct more complicated series of Know Your Rights educational workshops, assist in conducting comprehensive eligibility screenings to both help impacted individuals understand these court rulings, and reassure those applicants to whom the ruling does not apply to apply for health coverage, if eligible.

17. To allocate sufficient resources to re-educating our population and assisting our members in seeking alternative health coverage or financial resources, CASA has to shift resources from some of our core programming—all at the expense of our overall mission and other efforts. We estimate that, over a period of four to six months, in addition to the above expenditures, CASA may now need to assign two of our Health Navigators to devote approximately 33% of their time to helping eligible DACA recipients to secure alternative healthcare options due to the uncertainty in the implementation of the Final Rule during the Open Enrollment Period that this litigation has caused. In addition, we anticipate a comparable impact to our Organizing team—during this same 4-6 month time period, we estimate that two organizers would have to devote nearly 33% of their time to educating and counseling DACA recipients and community advocates about the legal changes. Together, this equates to at least $33,000 in staff salaries that CASA will need to spend to address the delay of the Final Rule. Time spent on this issue also places a greater burden on performing and complying with deliverables we have on other grants, which also significantly threatens our funding sources.

18. Similarly, CASA members who have made personal and financial decisions in reliance on the rule may now have to change their personal and health goals, potentially delay needed care, and experience renewed anxiety about their health, financial stability, and future. CASA members would be immediately and irreparably harmed by foregoing the benefits of the Final Rule.

19. Named Intervenors Claudia Moya Lopez and Hyun Kim are but two examples of CASA's many members who, prior to the preliminary injunction order, qualified under the Final Rule for Qualified Health Plans in the ACA marketplaces, such as Virginia's Insurance Marketplace, and who intended to apply and purchase affordable coverage. Both have significant health care needs, and for both, affordable coverage would mean financial stability to work and invest in their respective futures. Ms. Lopez was able to apply, enroll, purchase, and pay the first monthly premium for an affordable insurance plan on Virginia's Insurance Marketplace. But, as a result of the ruling on the preliminary injunction, she is concerned she will not be able to effectively use it for her regular blood tests and medical check-ups to ensure her leukemia diagnosis has not recurred. Mr. Kim, on the other hand, planned to apply, enroll, and purchase a plan on Virginia's Insurance Marketplace, but was not able to do so before the preliminary injunction issued; he was only able to enroll on December 18, 2024, after a temporary administrative stay of the preliminary injunction was entered by the Eighth Circuit Court of Appeals on December 16, 2024. His continued access to advanced premium tax credits in the health coverage plan that he enrolled in, allowing him to schedule regular health visits, also hangs in the balance with uncertainty here. These are two specific CASA members who have suffered harm because they are blocked from effectively utilizing affordable health coverage plans they enrolled in on Virginia's Insurance Marketplace due to the district court's ruling.

Although CASA has learned that the Eighth Circuit has temporarily stayed the court order enjoining enforcement of the Final Rule in 19 states, this temporary relief does not alleviate the confusion that the district court's order created nor does it promise lasting access for our members to affordable healthcare.

20. For CASA's members, the Final Rule represents bridging of a troubling gap in health care coverage that had kept DACA members from realizing their educational or employment dreams. Without the Final Rule, CASA's members who have DACA but who do not have coverage through an employer, for example those who own small businesses, experience direct financial injury and harm to their ability to access healthcare. If a formal stay of the preliminary injunction is entered, the appeals court reverses the district court's preliminary injunction decision or otherwise remands to the district court to transfer or dismiss the case, CASA's members would not be arbitrarily excluded from the ACA marketplace as they are now in Virginia, and CASA members who remain eligible in other states would not be chilled from enrolling, allowing them to live healthy, financially stable lives, and thrive.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: December 18, 2024

Respectfully submitted,

*George Escobar*
George Escobar