No. 24-3521

## In the
## United States Court of Appeals
### for the
## Eighth Circuit

———————————

THE STATE OF KANSAS, ET AL.

*Plaintiffs-Appellees,*

*v.*

UNITED STATES OF AMERICA, ET AL.,

*Defendants-Appellants.*

———————————

On Appeal from the United States District Court
for the District of North Dakota, No. 1:24-CV-00150-DMT-CRH
Hon. Daniel M. Traynor

———————————

**BRIEF OF *AMICI CURIAE* CLAUDIA MOYA LOPEZ, HYUN KIM,
DANIA QUEZADA TORRES, AND CASA, INC. IN SUPPORT OF
APPELLANTS' MOTION FOR A STAY PENDING APPEAL**

———————————

Nicholas Espiritu
Tanya Broder
NATIONAL IMMIGRATION LAW CENTER
3450 Wilshire Blvd., Suite 108–62
Los Angeles, CA 90010
espiritu@nilc.org
broder@nilc.org
Telephone: 213.639.3900
Facsimile: 213.639.3911

Joanna E. Cuevas Ingram
Hilda Bonilla
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 34573
Washington, D.C. 20043
cuevasingram@nilc.org
bonilla@nilc.org
Telephone: 202.216.0261
Facsimile: 202.216.0266

Matthew S. Rozen
    *Counsel of Record*
John Matthew Butler
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.,
Washington, D.C. 20036
mrozen@gibsondunn.com
mbutler@gibsondunn.com
Telephone: 202.955.8500
Facsimile: 202.467.0539

Betty X. Yang
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
byang@gibsondunn.com
Telephone: 214.698.3100
Facsimile: 214.571.2900

*Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a) and Eighth Circuit Rule 26.1A, CASA, Inc. hereby certifies that it is a non-profit organization, has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

Appellate Case: 24-3521    Page: 2    Date Filed: 12/23/2024 Entry ID: 5469587

# TABLE OF CONTENTS

**Pages**

INTRODUCTION AND INTERESTS OF AMICI CURIAE ..................... 1

ARGUMENT ....................................................................................... 3

    I.    Venue Is Improper Because North Dakota Lacks Standing ................................................................................. 3

    II.   The District Court's Order Rests On Erroneous Statutory Interpretation ........................................................ 6

    III.  The District Court's Injunction And Stay Order Will Cause Irreparable Harm To "Lawfully Present" Individuals ............................................................................. 11

CONCLUSION ........................................................................... 13

ii

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashley, Drew & N. Ry. Co. v. United Transp. Union*,
625 F.2d 1357 (8th Cir. 1980) ................................................................ 8

*California v. Texas*,
593 U.S. 659 (2021) ................................................................................ 8

*Comm'r v. Keystone Consol. Indus., Inc.*,
508 U.S. 152 (1993) .............................................................................. 10

*Loper Bright Enterprises v. Raimondo*,
144 S. Ct. 2244 (2024) ................................................................... 10, 11

*Taggart v. Lorenzen*,
587 U.S. 554 (2019) ................................................................................ 9

*United States v. Fontaine*,
697 F.3d 221 (3rd Cir. 2012) ................................................................. 9

*United States v. Texas*,
599 U.S. 670 ............................................................................................ 4

## Statutes

8 U.S.C. § 1611(a) ..................................................................................... 7

26 U.S.C. § 5000A(a) ................................................................................ 8

26 U.S.C. § 5000A(d)(1) ........................................................................... 8

26 U.S.C. § 5000A(d)(3) ........................................................................... 8

42 U.S.C. § 18032(d)(3) ............................................................................ 7

42 U.S.C. § 18032(f)(1) ............................................................................. 7

42 U.S.C. § 18032(f)(3) ............................................................................. 7

## Rules

Federal Rule of Appellate Procedure 29(a)(4)(E) ................................. 3

Appellate Case: 24-3521     Page: 4     Date Filed: 12/23/2024 Entry ID: 5469587

# TABLE OF AUTHORITIES

*(continued)*

Page(s)

## Regulations

8 C.F.R. § 1.3(a)(4)(vi) ......................................................... 9

8 C.F.R. § 103.12(a)(4)(vi) .................................................. 9

45 C.F.R. § 152.2(4)(vi) ...................................................... 10

89 Fed. Reg. 39,392 ............................................................. 1

89 Fed. Reg. 39,425/2 ......................................................... 5

89 Fed. Reg. 39,428/1 ......................................................... 5

iv

# INTRODUCTION AND INTERESTS OF AMICI CURIAE

*Amici* are three noncitizens and an immigrants-rights nonprofit organization that moved to intervene in the district court to defend the final rule at issue in this litigation. The district court preliminarily enjoined and stayed the final rule in 19 states without deciding *amici*'s motion to intervene or permitting *amici* to participate. Defendants and *amici* both appealed, and Defendants moved to stay the district court's order. *Amici* support a stay of that order, but are choosing at this stage to participate only as *amici*—rather than intervening in Defendants' appeal or filing a separate stay motion in their own appeal—to avoid complicating the expedited timeline entered by this Court.

*Amici* Claudia Moya Lopez, Hyun Kim, and Dania Quezada Torres are noncitizens who came to the United States as children, have lived most of their lives here, and were granted deferred action through the Deferred Action for Childhood Arrivals ("DACA") program. Earlier this year, Defendant the Centers for Medicare and Medicaid Services ("CMS") issued a rule that permits DACA recipients to purchase affordable health insurance through the marketplaces established by the Affordable Care Act ("ACA"). 89 Fed. Reg. 39,392 (May 8, 2024) ("Final Rule"). After

1

waiting for more than a decade for access to affordable healthcare, *amici* have each now purchased health insurance through the ACA marketplaces and have already paid their first premiums or received advanced premium tax credits through their plan.

*Amicus* CASA, Inc. is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 100,000 members. Its members include *amici* Lopez and Kim, and more than 2,700 other DACA recipients who gained access to the ACA marketplaces under the Final Rule. CASA's core mission includes supporting its members in improving their physical and mental health and social stability.

*Amici* each have a direct interest in Defendants' stay motion. By preliminarily enjoining and staying the Final Rule in 19 states—including Virginia, where *Amici* Lopez and Kim and many CASA members purchased their health plans—the district court effectively cancelled their recently acquired health-insurance plans. *See, e.g.*, Lopez Decl. ¶ 17-18; Kim Decl. ¶ 13, 15. The order will thus delay their access to important health insurance and medical care, forcing them to choose between foregoing medical treatment and assuming crushing medical debt. Further, if the order stands, CASA will need to expend funds to educate DACA

2

recipients about the change to their ACA eligibility and help them attempt to secure alternative healthcare options. While the district court's preliminary injunction and stay do not apply in Washington, where *amicus* Torres resides, she too has an interest ensuring that the Final Rule is ultimately upheld in this litigation.[1]

## ARGUMENT

## I. Venue Is Improper Because North Dakota Lacks Standing

Defendants correctly challenge the district court's conclusion that North Dakota has standing and that venue is therefore proper in the District of North Dakota. But North Dakota's evidence for standing is even weaker than Defendants acknowledge.

As Defendants explain, North Dakota's sole asserted basis for standing is its strained speculation that some unknown number of the 126 DACA recipients that reside in that State, *see* R.Doc. 103, at 2 n.2, would suddenly have left the country if the U.S. government had continued to deny them access to the ACA marketplaces, as it has done since

---

[1] Pursuant to <u>Federal Rule of Appellate Procedure 29(a)(4)(E)</u>, *amici* state that no counsel for any party authored this brief in whole or in part and that no entity or person, aside from *amici*, their members, and their counsel, made any monetary contribution toward the preparation or submission of this brief.

3

those marketplaces were created. According to North Dakota, the Final Rule will cause some number of these individuals to remain in North Dakota, imposing indirect financial costs on the State. *See* R.Doc. 27, at 10 (¶¶ 52-56).

Defendants correctly explain that such "indirect effects on state revenues and state spending" are not cognizable as a foundation for Article III standing. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). And even if they were cognizable, North Dakota failed to carry its burden of establishing that any DACA recipients would have left the State absent the Final Rule and that alleged expenditures on driver's licenses and education are not outweighed by reductions in emergency-healthcare costs. *See* Mot.8-11.

But the issue is not just North Dakota's legal error and failure of proof. Instead, the evidence actively *undercuts* North Dakota's theory of standing by illustrating just how implausible it is that the Final Rule would impose costs on the State given the vanishingly small size of its population of DACA recipients.

*First*, as of December 11, 2024, only *one* DACA recipient in North Dakota had obtained insurance through its ACA marketplace as a result

4

of the Rule.  R.Doc. 119-1, at 7.  While there is still time for others to enroll absent a stay, only a fraction of North Dakota's 126 DACA recipient residents are even eligible.  The Final Rule estimates that 27% of DACA recipients nationally are uninsured, and only "70 percent of this group will opt to enroll in the Exchanges."  89 Fed. Reg. at 39,425/2, 39,428/1.  That works out to just 19% of DACA recipients nationally—or fewer than 24 enrollees in North Dakota.  And that is assuming enrollment in North Dakota tracks CMS's predictions nationwide.  So far, it has fallen short, and North Dakota offers no evidence that will change.

*Second*, there is no evidence that any North Dakota enrollee would have left North Dakota without the Final Rule.  Plaintiffs' own evidence suggests they would not.  A study linked in the Amended Complaint asserts that 15.5 million of what the study disparagingly calls "illegal alien[s]" were present in the United States as of 2022.  *See* R.Doc. 50-1, at 13-14; *see also* R.Doc. 27, at 12 (FAC ¶ 67)  Of those 15.5 million, a declaration submitted in support of Plaintiffs' preliminary injunction motion asserts that from 2010 to 2018, just 305,000—or less than 2%—left the country voluntarily.  R.Doc. 35-1, at 4.  Even assuming that the same departure rate applies to DACA recipients, that would amount to

5

approximately **two** departures by a DACA recipient from North Dakota **per decade**. In reality, the departure rate is likely lower for DACA recipients given their deep ties to this country and the fact that DACA is only available to individuals who remained in the country continuously since 2007.

The district court failed to engage with any of this evidence. Instead, it found it sufficient that "[a]t least one" DACA recipient "eligible to enroll in a QHP will reside in North Dakota" and that healthcare benefits provide a "powerful incentive" to remain. R.Doc. 117 ("Op.") 8-9. But whatever added incentive access to the ACA marketplace may create to remain in the United States is irrelevant if only a handful of individuals in North Dakota actually enroll, those individuals were never planning to leave, and none of them imposes any cost on the state.

## II. The District Court's Order Rests On Erroneous Statutory Interpretation

Defendants also correctly argue that they are likely to succeed on the merits of their appeal because the district court erred in its interpretation of the Final Rule, ACA, and Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"). *See* Mot.12-18. Once

6

again, however, there are additional reasons to reject the district court's reasoning beyond those offered by Defendants.

**_First_**, the ACA expressly extends access to the ACA marketplaces to *all* individuals that qualify as "lawfully present," 42 U.S.C. § 18032(f)(3)—not just those that meet PRWORA's narrower definition of "qualified aliens," 8 U.S.C. § 1611(a), as the district court found, Op.11-14. The ACA uses a distinct, third term—"qualified individuals"—to define eligibility and says unambiguously that that anyone who meets that definition "*may enroll* in any qualified health plan." 42 U.S.C. § 18032(d)(3) (emphasis added). The definition of "qualified individual," in turn, includes all state residents that "seek to enroll in a qualified health plan" unless they are incarcerated or "not … lawfully present." *Id.* § 18032(f)(1), (3).

The ACA's express statement that "lawfully present" individuals "may enroll," 42 U.S.C. § 18032(d)(3), (f)(3), is irreconcilable with the narrower limits on eligibility that the district court reads into PRWORA. And Defendants are correct that the ACA's "later" and "more specific" grant of eligibility controls in the event of a conflict. Mot.16-17.

7

Were there any doubt, however, Congress eliminated it by *requiring* all lawfully present individuals—whether "qualified aliens" or not—to enroll in the ACA marketplaces. When the ACA was first enacted, all such individuals were subject to the Individual Mandate and faced a potentially steep tax penalty if they failed to obtain health insurance. *California v. Texas*, 593 U.S. 659, 665 (2021). The Individual Mandate applied to anyone who met the definition of "applicable individual," 26 U.S.C. § 5000A(a), which includes any "individual" in the United States—where a citizen or not—unless one of three exceptions applies, *id.* § 5000A(d)(1). The only exception relevant here exempted anyone who "is not a citizen or national of the United States or an alien lawfully present in the United States." *Id.* § 5000A(d)(3). No exception exempted lawfully present individuals who are not "qualified aliens."

It is inconceivable that Congress meant to prohibit lawfully present individuals from doing what the federal statute required. Courts do not tolerate interpretations that "engende[r] absurd consequences," *Ashley, Drew & N. Ry. Co. v. United Transp. Union*, 625 F.2d 1357, 1365 (8th Cir. 1980), and reading a statute to require "compliance with a regulatory regime" when compliance is "an impossibility" is as "absurd" as it gets,

8

*United States v. Fontaine*, <u>697 F.3d 221, 230</u> (3rd Cir. 2012). Congress therefore must have intended for ACA eligibility to extend at least as broadly as the original Individual Mandate and thus to encompass all individuals "lawfully present" in the United States, as the term is used in the ACA.

***Second***, *all* deferred action recipients necessarily meet the ACA's definition of "lawfully present" because that is how the term was defined immediately before and immediately after the ACA was enacted.

Since 1996, federal regulations promulgated by the Attorney General and the Department of Homeland Security defined "lawfully present" for purposes of other federal benefits statutes to include recipients of "deferred action," <u>8 C.F.R. § 103.12(a)(4)(vi)</u> (1997); <u>8 C.F.R. § 1.3(a)(4)(vi)</u>. Whatever the merit of that regulation as an interpretation of those other statutes, it is dispositive as to that term's meaning in the later-enacted ACA. "When a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" *Taggart v. Lorenzen*, <u>587 U.S. 554, 560</u> (2019). Accordingly, it is not just, as Defendants recognize, that "'Congress is aware of existing law when it passes legislation.'" Mot.15. Instead, established canons of interpretation go

9

further, mandating that when a term "ha[s] acquired a settled … administrative interpretation," courts must "accept the already settled meaning" when construing the phrase. *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993).

Further, ever since CMS first implemented the ACA marketplaces in 2010, it has defined "lawfully present" for purposes of marketplace access to include individuals with "deferred action." 45 C.F.R. § 152.2(4)(vi) (2010). Although CMS initially carved DACA recipients out of this definition for political reasons, it never offered a statutory basis for doing so and never wavered in its view that other deferred action recipients are lawfully present.

CMS's longstanding view that deferred action is a form of lawful presence is thus entitled to substantial weight, even after *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). Although *Loper Bright* eliminated judicial "deference" to agency interpretations, it nonetheless reaffirmed the centuries-old principle that "respect to Executive Branch interpretations" is "especially warranted" when the interpretation "was issued roughly contemporaneously with enactment of the statute and remained consistent over time." 144 S. Ct. at 2257-58. CMS's

10

"longstanding," "contemporaneou[s]," and "consistent" interpretation that deferred action is a form of lawful presence for ACA purposes thus warrants "'great respect,'" *id.*, and, here, should be dispositive as to whether DACA recipients are entitled to purchase healthcare on the ACA marketplaces.

## III. The District Court's Injunction And Stay Order Will Cause Irreparable Harm To "Lawfully Present" Individuals

CMS rightly emphasizes that the district court's injunction "will profoundly harm thousands of individuals who have already acted in good-faith reliance on the rule." Mot.18. *Amici* Lopez and Kim are two such examples. Lopez completed treatment for acute promyelocytic leukemia in November 2023, but since then has needed to receive regular blood tests to monitor for a potential recurrence. Lopez Decl. ¶¶ 10-13. In reliance on the Final Rule, Lopez signed up for health insurance through Virginia's insurance marketplace on December 9, 2024, and paid her first premium that same day. *Id.* ¶ 17. She anticipated that her insurance coverage would defray the costs of her blood tests and oncologist visits in 2025. *Id.* If the district court's order is not stayed, however, then Lopez will need to seek out alternative health insurance or, most likely, find a way to fund her upcoming medical appointments without

11

insurance. *Id.* ¶ 18. Such a breakdown and uncertainty in her healthcare coverage will cause her severe anxiety and may result in significant financial hardship. *Id.* ¶¶ 18-19.

Similarly, the Final Rule provided Kim his first access to affordable healthcare. Kim Decl. ¶¶ 11-13. As a restaurant worker who has been saving to attend college, he receives base pay and tips but no employer-sponsored health insurance. *Id.* ¶ 4. Because of his lack of access to health insurance, Kim has not had a physical in three years and has never seen a dentist. *Id.* ¶ 8. Under the Final Rule, he is eligible for tax credits and discounts in buying health insurance on the marketplace, which will allow him to access consistent preventative care for the first time in his life. *Id.* ¶¶ 12-13. In reliance on the Final Rule, Kim signed up for health insurance through the Virginia Insurance Marketplace and qualified for advance premium tax credits through his plan on December 18, 2024. *Id.* ¶ 13. If the district court's injunction and stay are left in place, however, Kim will be unable to afford such preventative care, placing him at risk of more serious medical issues and correspondingly higher medical costs in the future.

The harms caused by the district court's order do not stop with

DACA recipients. *Amicus* CASA has had to divert its resources to education and legal support to assist individuals both with DACA and with temporary protected status or who are otherwise lawfully present to understand their eligibility in light of the recent rulings. Escobar Decl. ¶¶ 16-17. As a result, through the end of the Open Enrollment Period, CASA expects to divert significant staff time to prepare additional educational materials, host a series of Know Your Rights educational workshops, and conduct comprehensive eligibility screenings to help impacted individuals understand the district court's ruling. *Id.* ¶ 16. CASA will also invest significant resources assuring those "lawfully present" individuals to whom to order does not apply—whether because they are not in the 19 States or because their status is not based on DACA—that they can apply for, purchase, and receive health coverage and tax credits in ACA marketplaces. *Id.*

## CONCLUSION

The Defendants-Appellants' motion to stay should be granted.

13

Date: December 19, 2024

Respectfully submitted,

*/s/ Matthew S. Rozen*

Nicholas Espiritu
Tanya Broder
NATIONAL IMMIGRATION
LAW CENTER
3450 Wilshire Boulevard
Suite 108–62
Los Angeles, CA 90010
espiritu@nilc.org
broder@nilc.org
Telephone: 213.639.3900
Facsimile: 213.639.3911

Joanna E. Cuevas Ingram
Hilda Bonilla
NATIONAL IMMIGRATION
LAW CENTER
P.O. Box 34573
Washington, D.C. 20043
cuevasingram@nilc.org
bonilla@nilc.org
Telephone: 202.216.0261
Facsimile: 202.216.0266

Matthew S. Rozen
   *Counsel of Record*
John Matthew Butler
GIBSON, DUNN &
CRUTCHER LLP
1700 M Street, N.W.,
Washington, D.C. 20036
mrozen@gibsondunn.com
mbutler@gibsondunn.com
Telephone: 202.955.8500
Facsimile: 202.467.0539

Betty X. Yang
GIBSON, DUNN &
CRUTCHER LLP
2001 Ross Avenue
Suite 2100
Dallas, Texas 75201
byang@gibsondunn.com
Telephone: 214.698.3100
Facsimile: 214.571.2900

*Counsel for Amici Curiae*

14

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation set forth in FRAP 29(a)(5) and 32(a)(7)(B)(i). This document contains 2,558 words, excluding the parts exempted by FRAP 32(f). This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

/s/   *Matthew S. Rozen*
Matthew S. Rozen

15

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2024, I filed the foregoing brief using the Court's CM/ECF system, which will send a notice of the filing to counsel for all parties.

/s/   *Matthew S. Rozen*
Matthew S. Rozen

16