No. 24-3521

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

————————————

STATE OF KANSAS, et al.,

Plaintiffs-Appellees,

v.

UNITED STATES OF AMERICA, et al.,

Defendants-Appellants.

————————————

On Appeal from the United States District Court
for the District of North Dakota

————————————

### BRIEF FOR APPELLANTS

————————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

CATHERINE M.A. CARROLL
  *Deputy Assistant Attorney General*

MELISSA N. PATTERSON
LEIF OVERVOLD
JOSHUA M. KOPPEL
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7226*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue, NW*
  *Washington, DC 20530*
  *(202) 305-1754*

## SUMMARY OF THE CASE AND
## STATEMENT REGARDING ORAL ARGUMENT

In May 2024, the Department of Health and Human Services issued a final rule that, among other things, clarifies that recipients of deferred action under the Deferred Action for Childhood Arrivals program are, like other deferred-action recipients, considered "lawfully present in the United States" for certain purposes under the Affordable Care Act (ACA) and consequently may be eligible to obtain health insurance on an ACA exchange and to receive certain federal subsidies. Plaintiff States—including North Dakota, whose only claimed injury turns on the theory that the rule could have indirect effects on state social-services spending— challenged the rule in the District of North Dakota and sought a preliminary injunction. After the rule had taken effect and the open-enrollment period had begun, the district court preliminarily enjoined the rule, holding that North Dakota had established standing and proper venue in the District of North Dakota and that there was a "fair chance" that plaintiffs would demonstrate that the rule is unlawful. A divided panel of this Court subsequently denied the government's emergency motion for a stay pending appeal.

The government believes that oral argument would aid in the consideration of this appeal and respectfully suggests that an allotment of 20 minutes per side would be appropriate.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE AND STATEMENT
REGARDING ORAL ARGUMENT

INTRODUCTION ................................................................................................. 1

STATEMENT OF JURISDICTION .................................................................... 3

STATEMENT OF THE ISSUES ......................................................................... 3

STATEMENT OF THE CASE ............................................................................. 4

    A.    Statutory and Regulatory Background ........................................... 4

    B.    The 2024 Rule ................................................................................. 9

    C.    Prior Proceedings ......................................................................... 10

SUMMARY OF ARGUMENT ......................................................................... 13

STANDARD OF REVIEW ............................................................................... 16

ARGUMENT ..................................................................................................... 16

I.    PLAINTIFFS LACK STANDING AND FAILED TO ESTABLISH THAT VENUE
WAS PROPER IN THE DISTRICT COURT ............................................... 16

    A.    North Dakota Lacks Standing. .................................................... 17

    B.    The Preliminary Injunction Should Be Reversed Because Venue
Was Improper. ............................................................................... 27

    C.    Although The Court Need Not Reach The Issue, The Remaining
Plaintiffs Also Lack Standing. .................................................... 30

II.    THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS ......................... 35

    A.    The Rule's Definition Of "Lawfully Present" Comports With The
Executive Branch's Established Understanding Of This Term
Across Federal Benefits Statutes. ............................................... 35

     B.     The District Court's Contrary Conclusions Were Erroneous. ................41

III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH STRONGLY AGAINST A PRELIMINARY INJUNCTION ................................................................ 44

     A.     The Injunction Is Unnecessary To Prevent Irreparable Harm To Plaintiffs.............................................................................................44

     B.     A Preliminary Injunction Would Greatly Undermine The Public Interest.............................................................................................47

CONCLUSION ........................................................................................................ 52

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Appellate Case: 24-3521    Page: 4    Date Filed: 01/21/2025 Entry ID: 5476436

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Affiliated Ute Citizens of Utah v. United States,*
406 U.S. 128 (1972) ........................................................................................25

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) .........................................................................21

*Barton v. Barr,*
590 U.S. 222 (2020) ..........................................................................................4

*Beber v. NavSav Holdings, LLC,*
118 F.4th 921 (8th Cir. 2024) ........................................................................47

*Benisek v. Lamone,*
585 U.S. 155 (2018) ........................................................................................47

*Biden v. Nebraska,*
600 U.S. 477 (2023) ........................................................................................20

*California v. Texas,*
593 U.S. 659 (2021) ................................................................................. 22, 23

*Chaudhry v. Holder,*
705 F.3d 289 (7th Cir. 2013) ............................................................37, 38, 40

*Department of Commerce v. New York,*
588 U.S. 752 (2019) ........................................................................................25

*Dorsey v. United States,*
567 U.S. 260 (2012) ........................................................................................43

*Estrada v. Becker,*
917 F.3d 1298 (11th Cir. 2019) ................................................................ 41, 42

*FDA v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ..............................................17, 19, 21, 23, 25, 31, 34

iii

*Firearms Regulatory Accountability Coal., Inc. v. Garland,*
   112 F.4th 507 (8th Cir. 2024)......................................................................44

*Fisher v. Pension Benefit Guar. Corp.,*
   994 F.3d 664 (D.C. Cir. 2021) ....................................................................40

*Florida v. Mellon,*
   273 U.S. 12 (1927) ................................................................................19, 20

*Georgia Republican Party v. SEC,*
   888 F.3d 1198 (11th Cir. 2018)..............................................................28, 30

*Henderson v. Stalder,*
   287 F.3d 374 (5th Cir. 2002).......................................................................34

*Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.,*
   115 F.4th 889 (8th Cir. 2024)......................................................................45

*Johnson v. Guzman Chavez,*
   594 U.S. 523 (2021) .......................................................................................4

*Maryland v. King,*
   567 U.S. 1301 (2012)...................................................................................47

*Massachusetts v. Laird,*
   400 U.S. 886 (1970).....................................................................................21

*Maybelline Co. v. Noxell Corp.,*
   813 F.2d 901 (8th Cir. 1987) .....................................................3, 17, 28, 30

*Miller v. Honkamp Krueger Fin. Servs., Inc.,*
   9 F.4th 1011 (8th Cir. 2021)........................................................................46

*Mississippi ex rel. Hood v. AU Optronics Corp.,*
   571 U.S. 161 (2014) ...............................................................................4, 40

*Missouri v. Biden,*
   52 F.4th 362 (8th Cir. 2022)........................................................................24

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
   78 F.4th 1011 (8th Cir. 2023)..................................................................47-48

iv

*MPAY Inc. v. Erie Custom Comput. Applications, Inc.*,
   970 F.3d 1010 (8th Cir. 2020) ................................................................16

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ............................................................. 3, 17, 22, 33

*NFIB v. Sebelius*,
   567 U.S. 519 (2012) ............................................................................5

*Ng v. Board of Regents of the Univ. of Minn.*,
   64 F.4th 992 (8th Cir. 2023) ...............................................................46

*NLRB v. SW Gen., Inc.*,
   580 U.S. 288 (2017) ...........................................................................42

*Novus Franchising, Inc. v. Dawson*,
   725 F.3d 885 (8th Cir. 2013) ...............................................................29

*Printz v. United States*,
   521 U.S. 898 (1997) ...........................................................................20

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ....................................................................... 4, 43

*Railway Labor Executives' Ass'n v. ICC*,
   958 F.2d 252 (9th Cir. 1991) ...........................................................28-29

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) .............................................................................29

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ...........................................................................24

*Taggart v. Lorenzen*,
   587 U.S. 554 (2019) ...........................................................................40

*Texas v. United States*,
   50 F.4th 498 (5th Cir. 2022) ...........................................................41-42

*Texas v. United States*,
   No. 1:18-CV-00068, 2023 WL 5950808 (S.D. Tex. Sept. 13, 2023) .............................8

Appellate Case: 24-3521     Page: 7     Date Filed: 01/21/2025 Entry ID: 5476436

*Texas v. United States*,
No. 23-40653, slip op. (Jan. 17, 2025) ................................................................8

*United States v. Chase*,
135 U.S. 255 (1890) ..............................................................................................43

*United States v. Kidd*,
963 F.3d 742 (8th Cir. 2020) ........................................................................ 4, 43

*United States v. Texas*,
599 U.S. 670 (2023) ................................................ 3, 18, 19, 21, 21-22

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................................ 16, 44, 46, 51

**U.S. Constitution:**

Art. III, § 2.............................................................................................................3

**Statutes:**

Balanced Budget Act of 1997,
Pub. L. No. 105-33, § 5561, 111 Stat. 251, 638 .......................................... 5, 37

Immigration Act of 1990,
Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5029-30 ....................................5

Patient Protection and Affordable Care Act,
Pub. L. No. 111-148, 124 Stat. 119 (2010) .....................................................5

REAL ID Act of 2005,
Pub. L. No. 109-13, § 202(c)(2)(B)(viii), 119 Stat. 302, 313 ...........................5

8 U.S.C. § 1182(a)(9)(B)(i) .......................................................................................39

8 U.S.C. § 1182(a)(9)(B)(ii) ...............................................................................37, 42

8 U.S.C. § 1611 ..................................................................................................... 4, 5

8 U.S.C. § 1611(a) ...................................................................................... 4, 36, 42

Appellate Case: 24-3521     Page: 8     Date Filed: 01/21/2025 Entry ID: 5476436

8 U.S.C. § 1611(b) .................................................................................42

8 U.S.C. § 1611(b)(2) ...............................................................4, 5, 36, 42

8 U.S.C. § 1611(b)(3)-(4) ...................................................................5, 37

8 U.S.C. § 1641(b) .............................................................................4, 36

26 U.S.C. § 36B ................................................................................6, 35

28 U.S.C. § 1292(a)(1) ...........................................................................3

28 U.S.C. § 1331 ..................................................................................3

28 U.S.C. § 1391(b) ..............................................................................28

28 U.S.C. § 1391(e)(1) ..........................................................................28

28 U.S.C. § 1391(e)(1)(C) ...........................................................3, 27, 29

42 U.S.C. § 18021(a)(1) ..........................................................................5

42 U.S.C. § 18022(b) .............................................................................5

42 U.S.C. § 18031(b)(1) ..........................................................................6

42 U.S.C. § 18031(d)(2)(A) .......................................................................5

42 U.S.C. § 18031(d)(4) ..........................................................................6

42 U.S.C. § 18031(d)(5)(A) ......................................................................34

42 U.S.C. § 18032 ................................................................................4

42 U.S.C. § 18032(f)(1)(A) .......................................................................6

42 U.S.C. § 18032(f)(3) ...............................................................6, 35, 42

42 U.S.C. § 18041(a)(1) .......................................................................7, 36

42 U.S.C. § 18041(c)(1) ..........................................................................6

vii

Appellate Case: 24-3521    Page: 9    Date Filed: 01/21/2025 Entry ID: 5476436

42 U.S.C. § 18071(b) ........................................................................6

42 U.S.C. § 18071(c) ........................................................................6

42 U.S.C. § 18071(e)(2) ...............................................................6, 35

42 U.S.C. § 18081 ........................................................................6, 35

42 U.S.C. § 18081(a)(1) ..............................................................6, 36

42 U.S.C. § 18082(c) ........................................................................6

42 U.S.C. § 18082(c)(2) ..................................................................35

Idaho Code Ann. § 49-303(14) .......................................................41

Ind. Code Ann. § 9-13-2-92.3(a)(2)(G) ..........................................40

Ind. Code Ann. § 9-24-11-5(c)(4) ...................................................40

Kan. Stat. Ann. § 8-237(i) ...............................................................40

Kan. Stat. Ann. § 8-240(b)(2)(H) ....................................................40

Ky. Rev. Stat. Ann. § 304.17B-021(1)(a) .......................................34

Mont. Code. Ann. § 61-5-105(10) ...................................................41

N.D. Cent. Code Ann. § 15.1-06-01(1)(c) .......................................27

S.D. Codified Laws § 32-12-1.1(7) .................................................40

**Regulations:**

8 C.F.R. § 1.3 ...........................................................................36, 42

8 C.F.R. § 1.3(a)(4)(vi) .....................................................................5

8 C.F.R. § 236.21(c) ........................................................................24

8 C.F.R. § 236.22(b)(1) ...................................................................24

Appellate Case: 24-3521     Page: 10     Date Filed: 01/21/2025 Entry ID: 5476436

8 C.F.R. § 236.22(b)(2) ........................................................................22

8 C.F.R. § 274a.12(c)(33) ....................................................................24

42 C.F.R. § 435.139 ............................................................................22

42 C.F.R. § 435.406(b) ........................................................................22

42 C.F.R. § 440.255(c) ........................................................................22

45 C.F.R. § 152.2 ..................................................................................7

45 C.F.R. § 152.2(1) ...........................................................................38

45 C.F.R. § 152.2(4)(vi) .......................................................................38

45 C.F.R. § 152.2(8) (2023) ..................................................................8

45 C.F.R. § 155.410(e)(4) .....................................................................9

45 C.F.R. § 155.420(b)(1) ...................................................................11

**Legislative Materials:**

Cong. Research Serv., Analysis of June 15, 2012 DHS Memorandum, 20-23
    (2012), https://perma.cc/RA9Z-7RSK ........................................5

**Other Authorities:**

61 Fed. Reg. 47,039 (Sept. 6, 1996) ................................................ 5, 36

75 Fed. Reg. 45,014 (July 30, 2010) ................................................. 7, 38

77 Fed. Reg. 18,310 (Mar. 27, 2012) ...................................................7

77 Fed. Reg. 52,614 (Aug. 30, 2012) ..........................................8, 38, 39

87 Fed. Reg. 53,152 (Aug. 30, 2022)........................8, 10, 37, 38, 39, 40, 41, 45

88 Fed. Reg. 25,313 (Apr. 26, 2023) ....................................................9

Appellate Case: 24-3521     Page: 11     Date Filed: 01/21/2025 Entry ID: 5476436

89 Fed. Reg. 39,392 (May 8, 2024)................................................................*passim*

Berry Dunn McNeil & Parker LLC, *Kentucky Health Benefit Exchange (KHBE): Programmatic Compliance Report* (June 21, 2024), https://perma.cc/D8E2-AF8M......32

Centers for Medicare & Medicaid Services, HHS, *Health Insurance Marketplaces 2024 Open Enrollment Report*, https://perma.cc/FZQ6-X5Y2.....................................34

Memorandum from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, to Field Leadership, Re: *Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* (May 6, 2009) ..........................................................37

Memorandum from Janet Napolitano, Sec'y, U.S. Dep't of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs & Border Protection, et al. (June 15, 2012), https://perma.cc/PRR8-PBT7 ...................................................... 7, 8

Memorandum from Johnny N. Williams, Executive Associate Commissioner, Office of Field Operations, to Regional Directors, Re: *Unlawful Presence* (June 12, 2002) ........................................................................................................37

Robert Warren, *Reverse Migration to Mexico Led to US Undocumented Population Decline: 2010 to 2018*, 8 J. on Migration & Hum. Sec. 32 (2020), https://journals.sagepub.com/doi/epub/10.1177/2331502420906125 ...................24

x

**INTRODUCTION**

Under the Affordable Care Act (ACA), noncitizens may be eligible to purchase insurance through an exchange established by the ACA and to receive certain federal subsidies, provided that they are "lawfully present in the United States." For almost three decades, the Executive Branch has understood this term of art to encompass recipients of deferred action for purposes of certain federal benefits statutes. In May 2024, the Department of Health and Human Services (HHS) issued a final rule to remove an exception it had previously adopted to this well-established understanding for recipients of deferred action through the Deferred Action for Childhood Arrivals (DACA) program, thus allowing DACA recipients to access affordable health insurance under the ACA.

Several months after the rule issued, 19 plaintiff States challenged the rule in the District of North Dakota, asserting that venue was proper there on the theory that North Dakota has standing based not on any claim that the rule imposes costs directly on the State, but rather on the assertion that the rule could indirectly cause increased need for social-services spending within the State. After the rule had taken effect, the open-enrollment period had begun, and hundreds of DACA recipients' ACA health-insurance plans had already gone into effect, the district court issued a preliminary injunction and stay of the rule's effective date within the 19 plaintiff States, resulting in the cancellation of thousands of health-insurance policies in which DACA

recipients had already enrolled, as well as the withdrawal of eligibility for tens of thousands of additional uninsured individuals in plaintiff States.

The district court's decision was erroneous on multiple grounds. Plaintiffs—a minority of States objecting to the policy reflected in the HHS rule—lack standing and failed to establish proper venue in the District of North Dakota based on alleged indirect harms associated with the approximately 130 DACA recipients in the State of North Dakota. And, while the district court applied the wrong standard in looking just to whether plaintiffs had a "fair chance" of demonstrating that the rule was unlawful, the rule is in any event entirely lawful. Indeed, it simply aligns HHS's understanding of "lawfully present" under the ACA with the Executive Branch's long-established understanding of the same language in other federal benefits statutes. That longstanding interpretation, which the district court failed to acknowledge, served as the backdrop against which Congress enacted the ACA, and HHS reasonably exercised its authority to define "lawfully present" for purposes of the ACA by adopting that interpretation in the rule. Finally, the district court erroneously found that plaintiffs satisfied their burden of establishing irreparable harm sufficient to warrant preliminary relief based on the same indirect and speculative harms that are insufficient to establish standing. Any such harms are in any case significantly outweighed by the certain and substantial harms to the government and individual DACA recipients, among others, resulting from the district court's order.

2

## STATEMENT OF JURISDICTION

Plaintiffs asserted jurisdiction in district court under 28 U.S.C. § 1331. App. 52; R. Doc. 27, at 3. On December 9, 2024, the district court issued a preliminary injunction. App. 181-198; R. Doc. 117; Add. 1-18. On December 11, 2024, the government filed a notice of appeal. App. 209; R. Doc. 120. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1), extending to the entirety of the order granting injunctive relief. *See Maybelline Co. v. Noxell Corp.*, 813 F.2d 901, 903 n.1 (8th Cir. 1987).

## STATEMENT OF THE ISSUES

1. Whether plaintiff States failed to establish standing or proper venue in the District of North Dakota to preliminarily enjoin the challenged HHS rule.

The most apposite authorities are:

- *Murthy v. Missouri*, 603 U.S. 43 (2024);

- *United States v. Texas*, 599 U.S. 670 (2023); and

- *Maybelline Co. v. Noxell Corp.*, 813 F.2d 901 (8th Cir. 1987).

The most apposite constitutional and statutory provisions are:

- U.S. Const. art. III, § 2; and

- 28 U.S.C. § 1391(e)(1)(C).

2. Whether, assuming it had jurisdiction and venue was proper, the district court abused its discretion in preliminarily enjoining the challenged HHS rule.

The most apposite authorities are:

- *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161 (2014);

- *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012); and

- *United States v. Kidd*, 963 F.3d 742 (8th Cir. 2020).

The most apposite statutory provisions are:

- 8 U.S.C. § 1611; and

- 42 U.S.C. § 18032

## STATEMENT OF THE CASE

### A. Statutory and Regulatory Background

**1.** The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) generally restricts eligibility for federal public benefits to "qualified alien[s]." 8 U.S.C. § 1611(a).[1]  That term includes noncitizens admitted for permanent residence and certain others specified in the statute.  *See id.* § 1641(b).  PRWORA also makes clear that, for certain benefits, this restriction does not apply to a separate, broader category:  noncitizens "lawfully present in the United States as determined by the Attorney General" (and now the Secretary of Homeland Security).  *Id.* § 1611(b)(2); *see Johnson v. Guzman Chavez*, 594 U.S. 523, 527 n.l (2021) (noting the Secretary generally may enforce Immigration and Nationality Act provisions referencing the Attorney General).

---

[1] Federal law refers to foreign nationals as "aliens."  Federal agencies typically refer to such persons as "noncitizens."  *See Barton v. Barr*, 590 U.S. 222, 226 n.2 (2020).

4

Two weeks after PRWORA's enactment, the Executive Branch promulgated a regulation defining "lawfully present" noncitizens under § 1611(b)(2). 61 Fed. Reg. 47,039, 47,040 (Sept. 6, 1996). That definition encompassed various categories of noncitizens beyond those the statute defines as "qualified alien[s]," including noncitizens "in deferred action status." *Id.*; *see* 8 C.F.R. § 1.3(a)(4)(vi).[2] Congress subsequently amended 8 U.S.C. § 1611 to specify additional categories of benefits payable to noncitizens whom the Executive Branch deems "lawfully present" for these purposes. *See* 8 U.S.C. § 1611(b)(3)-(4); Balanced Budget Act of 1997, Pub. L. No. 105-33, § 5561, 111 Stat. 251, 638.

**2.** Against this backdrop, in 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), to increase access to affordable health care. *See NFIB v. Sebelius*, 567 U.S. 519, 538 (2012). The ACA requires the creation of an "Exchange" for each State to "make available qualified health plans [(QHPs)] to qualified individuals." 42 U.S.C. § 18031(d)(2)(A).[3] Some

---

[2] Over decades, the Department of Homeland Security (DHS) and its predecessors have implemented more than 20 policies granting deferred action or similar reprieves from removal. *See* Cong. Research Serv., Analysis of June 15, 2012 DHS Memorandum, 20-23 (2012), https://perma.cc/RA9Z-7RSK. Congress has approved a number of these policies, *see, e.g.*, Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5029-30, and recognized DHS's authority to grant deferred action, *see* REAL ID Act of 2005, Pub. L. No. 109-13, § 202(c)(2)(B)(viii), 119 Stat. 302, 313.

[3] A QHP provides certain insurance benefits constituting an "essential health benefits package" and is offered by a health insurance issuer meeting specified standards. 42 U.S.C. §§ 18021(a)(1), 18022(b).

Appellate Case: 24-3521     Page: 17     Date Filed: 01/21/2025 Entry ID: 5476436

States operate and assume responsibility for their own State-based Exchanges (SBEs). *See id.* § 18031(b)(1), (d)(4). Others leave these responsibilities to the federal government. *See id.* § 18041(c)(1).

Congress provided that to be eligible to enroll in a QHP through their State's exchange, a "qualified individual" must, among other requirements, be a U.S. citizen or national or a noncitizen "lawfully present in the United States." 42 U.S.C. § 18032(f)(3).[4] A qualified individual whose household income is below certain thresholds may be eligible for certain subsidies to assist in obtaining care or paying monthly premiums. *See id.* §§ 18071(b), (c), 18081; 26 U.S.C. § 36B; *see also* 42 U.S.C. § 18082(c) (advanced payment of tax credits). To be eligible for such subsidies, a qualified individual must also be a U.S. citizen or national or a noncitizen "lawfully present in the United States." 42 U.S.C. § 18071(e)(2).

Like PRWORA, the ACA leaves it to the Executive Branch to define which noncitizens are "lawfully present" for purposes of the statute. The ACA directs HHS to "establish a program" for determining eligibility, including whether a noncitizen is "lawfully present in the United States." 42 U.S.C. § 18081(a)(1). And it directs HHS more generally to "issue regulations setting standards for meeting the requirements

---

[4] The statute generally defines a "qualified individual" as an individual who "(i) is seeking to enroll in a [QHP] in the individual market offered through the Exchange; and (ii) resides in the State that established the Exchange." 42 U.S.C. § 18032(f)(1)(A).

Appellate Case: 24-3521     Page: 18     Date Filed: 01/21/2025 Entry ID: 5476436

under this title," including "with respect to … the establishment and operation of Exchanges." *Id.* § 18041(a)(1).

In 2010, consistent with that term's longstanding meaning under PRWORA, HHS defined "lawfully present" for ACA purposes to include noncitizens "in deferred action status." 75 Fed. Reg. 45,014, 45,030 (July 30, 2010) (codified at 45 C.F.R. § 152.2). When HHS finalized its first rule implementing the ACA's Exchange and QHP provisions, it adopted this definition. *See* 77 Fed. Reg. 18,310, 18,314, 18,445 (Mar. 27, 2012) (adopting definition codified at 45 C.F.R. § 152.2).

**3.** In 2012, the Secretary of Homeland Security issued a memorandum establishing the DACA program. *See* Memorandum from Janet Napolitano, Sec'y, U.S. Dep't of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs & Border Protection, et al. (June 15, 2012), https://perma.cc/PRR8-PBT7. This memorandum "confer[red] no substantive right, immigration status[,] or pathway to citizenship," but it set forth how the Department of Homeland Security (DHS) would exercise its prosecutorial discretion with respect to certain "low priority cases." *Id.* at 1, 3. Specifically, DACA allows certain noncitizens to apply for a renewable two-year period of deferred action if they (1) "came to the United States under the age of sixteen"; (2) had "continuously resided in the United States for a[t] least five years preceding" and were "present" in the United States on the date of the memorandum; (3) were in school, had graduated high school or earned a GED, or were honorably discharged veterans; (4) had not been "convicted of a felony, a significant

7

misdemeanor, [or] multiple other misdemeanors," and did not otherwise "pose[] a threat to national security or public safety"; and (5) were "not above the age of thirty." *Id.* at 1. If these noncitizens were granted deferred action, they generally would not be placed in removal proceedings or removed from the United States, and they could apply for employment authorization. *Id.* at 2-3.

HHS amended its definition of "lawfully present" after the DACA memorandum issued. It understood the "DACA process" as being "designed to ensure that governmental resources for the removal of individuals are focused on high priority cases … and not on low priority cases." 77 Fed. Reg. 52,614, 52,615 (Aug. 30, 2012). Because HHS then considered it not "consistent with the reasons offered for adopting the DACA process to extend health insurance subsidies" to DACA recipients, the agency crafted an "[e]xception" to its prior definition of "lawfully present," specifically excluding DACA recipients alone among all other deferred-action recipients. *Id.* at 52,615-16; *see* 45 C.F.R. § 152.2(8) (2023).

In 2022, DHS replaced the 2012 memorandum establishing the DACA program with a regulation. *See* 87 Fed. Reg. 53,152 (Aug. 30, 2022). That rule was enjoined, but the order was partially stayed. *See Texas v. United States*, No. 1:18-CV-00068, 2023 WL 5950808, at *1 (S.D. Tex. Sept. 13, 2023). On the date of this brief's filing, the Fifth Circuit affirmed in part the district court's injunction but limited its scope to the State of Texas. *Texas v. United States*, No. 23-40653, slip op. at 33-37 (Jan. 17, 2025).

8

### B.    The 2024 Rule

In April 2023, HHS issued a Notice of Proposed Rulemaking (NPRM) to, among other things, remove the DACA exception from the definition of "lawfully present" under the ACA.  *See* 88 Fed. Reg. 25,313 (Apr. 26, 2023).  The final rule was promulgated May 8, 2024, and took effect November 1, 2024, generally coinciding with the open-enrollment period for purchasing health insurance through the ACA exchanges, which runs through January 15, 2025.  *See* 89 Fed. Reg. 39,392, 39,415 (May 8, 2024); 45 C.F.R. § 155.410(e)(4).

Following the rule's revision of HHS's definition of "lawfully present" as used in the ACA, otherwise-eligible DACA recipients can enroll in a QHP through an exchange and apply for federal subsidies.  89 Fed. Reg. at 39,395-96.[5]  Explaining the change, HHS recognized that its prior definition had treated DACA recipients differently from other deferred-action recipients for purposes of the ACA, and that HHS had previously chosen to do so based on its view that DHS's original rationale for the DACA policy did not indicate that the "insurance affordability programs" should be extended to DACA recipients.  *Id.* at 39,394-95.  Based on further consideration, HHS concluded that its previous decision to treat DACA differently

---

[5] In the NPRM, HHS also proposed modifying its definition of "lawfully present" for purposes of determining DACA recipients' eligibility for Medicaid and the Children's Health Insurance Program.  *See* 88 Fed. Reg. at 25,316-17.  After "carefully consider[ing] the comments" related to this proposal, HHS determined not to finalize a definition for "lawful presence" for these purposes at this time.  89 Fed. Reg. at 39,393.

Appellate Case: 24-3521     Page: 21     Date Filed: 01/21/2025 Entry ID: 5476436

than other forms of deferred action was not required by the ACA and indeed "failed to best effectuate congressional intent" to lower the number of uninsured individuals in the country and make affordable health insurance more available. *Id.* at 39,395; *see id.* at 39,398. HHS also recognized that treating DACA recipients like other deferred-action recipients accorded with DHS's longstanding interpretation of "lawfully present" to include those "'whose temporary presence in the United States the Government has chosen to tolerate for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and other factors.'" *Id.* at 39,395 (quoting 87 Fed. Reg. at 53,156). And it determined that extending eligibility was consistent with the 2022 DACA regulation's goals of "provid[ing] recipients with a degree of stability and assurance that would allow them to obtain education and lawful employment, including because recipients remain lower priorities for removal." *Id.*

### C. Prior Proceedings

On August 8, 2024, three months after the final rule issued, North Dakota and 14 other States challenged the rule in the District of North Dakota. *See* App. 27-49; R. Doc. 1. Despite the rule's looming November 1 effective date, the States waited several more weeks to seek a preliminary injunction, by which point four more States had joined the suit. *See* App. 50-72; R. Doc. 27; R. Doc. 35. Twenty other States subsequently filed an amicus brief supporting the final rule, explaining, among other things, that it would reduce state costs by reducing emergency-room visits. *See* R.

10

Doc. 69. Following completion of briefing on the preliminary-injunction motion, the district court held a hearing on October 15 and ordered supplemental filings regarding standing and venue. R. Doc. 84; R. Doc. 87. Defendants subsequently moved to dismiss plaintiffs' complaint for lack of standing and failure to state a claim and, in the alternative, to transfer the case for improper venue. *See* R. Doc. 108.

On December 9, over a month after enrollment began and after some DACA recipients' health-insurance plans became effective on December 1, the district court granted a preliminary injunction and stay. App. 198; R. Doc. 117, at 18; Add. 18; *see* 45 C.F.R. § 155.420(b)(1). The court concluded that North Dakota had standing and that venue in the District of North Dakota was consequently proper. *See* App. 187-90; R. Doc. 117, at 7-10; Add. 7-10. Although North Dakota (like all but three plaintiff States) does not run its own ACA exchange, the court held that it had established standing based on asserted costs relating to issuing drivers' licenses to the approximately 130 DACA recipients residing within the State or providing public education to at least one DACA recipient or a recipient's dependent enrolled in the State's public-education system. App. 188; R. Doc. 117, at 8; Add. 8. The court did not cite any evidence that such costs were traceable to the final rule making DACA recipients eligible for ACA health-insurance plans for the first time. Nor did the court cite any evidence that enjoining the rule would remedy North Dakota's asserted injury by prompting any DACA recipient or their dependent to leave the State. Instead, the court relied on "a common-sense inference[] that the powerful incentive of health

11

care will encourage aliens who may otherwise vacate the [p]laintiff States to remain," "creat[ing] a substantial risk North Dakota will suffer monetary harm via issuing [driver's] licenses and providing education." App. 189; R. Doc. 117, at 9; Add. 9.

The court did not evaluate whether plaintiffs were "likely" to succeed on the merits, determining only that they demonstrated a "fair chance" of doing so. App. 193-94; R. Doc. 117, at 13-14; Add. 13-14. The court reasoned that DACA recipients are not "lawfully present" as required to enroll in QHPs under the ACA, noting that noncitizens in deferred-action status remain removable and suggesting that only "qualified aliens" under PRWORA could be considered "lawfully present" under the ACA. App. 191-94; R. Doc. 117, at 11-14; Add. 11-14. The court rested its irreparable-harm conclusion on the same costs States asserted regarding standing and—presumably referring to the three plaintiff States operating exchanges—the "Hobson's choice" of "comply[ing] with what they believe to be an unlawful directive or los[ing] federal government support" to operate exchanges. App. 195; R. Doc. 117, at 15; Add. 15. Based on the same reasoning, the court granted a stay of the rule's effective date and denied defendants' motion to dismiss or transfer. App. 197-98; R. Doc. 117, at 17-18; Add. 17-18. It consequently preliminarily barred

defendants from "enforcing the [f]inal [r]ule against the 19 [p]laintiff States." App. 198; R. Doc. 117, at 18; Add. 18.[6]

The district court later denied the government's motion for a stay pending appeal. App. 210-13; R. Doc. 130. The federal government filed an emergency motion in this Court to stay the preliminary injunction pending appeal. This Court issued an administrative stay of the district court's order, and a divided panel subsequently issued an opinion denying the stay motion. *See* Opinion, Dec. 23, 2024.

## SUMMARY OF ARGUMENT

**I. A.** The State of North Dakota, the sole plaintiff whose standing the district court assessed, failed to establish Article III standing. North Dakota is not directly regulated by the challenged rule, and the Supreme Court has repeatedly held that standing is significantly more difficult to establish where, as here, it depends on an indirect-effects theory of harm based on the responses of regulated third parties to the government's action. Indeed, the Court has recently rejected a similar theory of standing based on precisely the same sorts of incidental costs allegedly incurred by a State in providing social services that North Dakota alleges in this case, reasoning that such indirect effects are commonplace in our federal system of dual sovereignty. The district court's contrary reasoning would allow a State to challenge virtually any federal

---

[6] The stay and preliminary injunction are coextensive. *See* App. 198; R. Doc. 117, at 18; Add. 18; R. Doc. 142, at 2-3. References herein to the district court's injunction encompass the stay as well.

13

regulation, and neither plaintiffs nor the district court identified any basis for that startling result.

Even if plaintiffs' indirect-effects theory of standing were cognizable, North Dakota failed to make the clear showing of injury, causation, and redressability required to establish Article III standing at the preliminary-injunction stage. The final rule is likely to decrease plaintiff States' spending on social services by reducing emergency-healthcare costs. Moreover, plaintiffs provided no non-speculative basis to conclude that any one of the approximately 130 DACA recipients in North Dakota would leave the State or country but for the newly created eligibility to enroll in health insurance on an ACA exchange—eligibility they have never had despite many years' residence in the United States—such that any increase in the State's social-services spending could be thought to have been caused by the rule or redressed by an order enjoining it.

**B.** In order for venue to be proper in the District of North Dakota, North Dakota—the sole plaintiff that resides in that District—must establish standing independent of the other plaintiffs. Because North Dakota failed to do so, plaintiffs further failed to establish proper venue in the District of North Dakota. As this Court has previously recognized, that failure to establish proper venue represents another basis to reverse the district court's preliminary injunction.

**C.** While the Court need not reach the issue, none of the other plaintiff States has established standing either. Fifteen other plaintiff States, like North Dakota, use a

14

Federally-facilitated Exchange (FFE) and seek to establish standing based on the same unavailing theory that the rule could have indirect effects on state expenditures. The three other plaintiff States run their own ACA exchanges, but they failed to establish that they incurred any administrative costs in changing their exchange platforms as a result of the rule, much less any forward-looking harms that might support the district court's award of prospective injunctive relief.

**II.** Even assuming plaintiffs established standing and venue, plaintiffs are not likely to succeed on the merits. Congress specifically empowered HHS to define who is "lawfully present" for purposes of the ACA. HHS acted entirely lawfully by exercising this authority to adopt an understanding of the term that comports with the Executive Branch's decades-old understanding of identical language in other federal benefits provisions, which was in place when Congress enacted the ACA and which Congress has never disturbed. The district court's decision ignored this longstanding status quo and improperly conflated the eligibility restriction imposed by the ACA with a distinct and narrower category of "qualified alien[s]" defined by PRWORA.

**III.** The preliminary injunction should also be reversed because the equities greatly favor the government. For the same reasons that plaintiffs fail to demonstrate any injury sufficient to establish their standing, they have not shown that they are likely to suffer any irreparable harm in the absence of an injunction, much less any harms that would outweigh DACA recipients' contributions to tax revenues and the rule's likely effect in decreasing emergency-healthcare expenditures.

15

On the other side of the balance, the preliminary injunction imposes certain and serious harms on the government and the public. The government is irreparably injured by an order preventing it from effectuating the ACA's goal of expanding access to affordable health care. The injunction also imposes significant, unnecessary costs on the approximately 44,000 previously uninsured DACA recipients living in plaintiff States who are precluded from enrolling in insurance plans through the ACA exchanges or have had their insurance coverage canceled as a result of the district court's order, along with their families and communities.

## STANDARD OF REVIEW

To obtain a preliminary injunction, a plaintiff must show that it is likely to succeed on the merits, that it would suffer irreparable harm absent a preliminary injunction, and that the balance of the equities and the public interest favor an injunction. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). This Court reviews a district court's ultimate ruling on a preliminary injunction for abuse of discretion, but underlying legal conclusions are reviewed de novo. *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020).

## ARGUMENT

### I. PLAINTIFFS LACK STANDING AND FAILED TO ESTABLISH THAT VENUE WAS PROPER IN THE DISTRICT COURT

As a threshold matter, the district court erred in issuing a preliminary injunction because none of the plaintiffs established standing to sue and venue was improper in

16

the district court.  That error alone warrants reversal.  *See Murthy v. Missouri*, 603 U.S. 43, 76 (2024) (reversing preliminary injunction because plaintiffs lacked standing); *Maybelline Co. v. Noxell Corp.*, 813 F.2d 901, 907 (8th Cir. 1987) (reversing preliminary injunction because district court erred in finding venue was proper).

A.      **North Dakota Lacks Standing.**

At the preliminary-injunction stage, plaintiffs bear the burden of "mak[ing] a 'clear showing' that [they are] 'likely' to establish each element of standing," namely, that they have "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Murthy*, 603 U.S. at 57-58.  When, as in this case, plaintiffs are not directly regulated by the federal rule they challenge, standing "is ordinarily substantially more difficult to establish … because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else."  *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (citations and quotation marks omitted).  Such causation will "ordinarily hinge[] on the response of the regulated … third part[ies] to the government action."  *Id.* at 383 (quotation marks omitted).  In such a case, plaintiffs "cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts'" and "must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs."  *Id.* (quotation marks omitted).

Appellate Case: 24-3521     Page: 29     Date Filed: 01/21/2025 Entry ID: 5476436

It is undisputed that North Dakota and the other plaintiff States that use the FFE will "not suffer a direct injury from the [f]inal [r]ule" because "the federal government will bear the costs associated with the expansion" of exchange eligibility in those States. App. 187; R. Doc. 117, at 7; Add. 7. The district court held, however, that North Dakota has standing based on indirect effects of the final rule. In particular, the court posited that DACA recipients and their dependents were likely to leave the State of North Dakota, but that the final rule would "incentivize those who plan to leave … to remain," App. 189; R. Doc. 117, at 9; Add. 9, and that North Dakota will therefore have to expend more resources to issue driver licenses to DACA recipients and provide education to those recipients or their dependents, App. 188-90; R. Doc. 117, at 8-10; Add. 8-10. The court's holding is flawed for multiple reasons.[7]

**1.** The Supreme Court recently rejected a similar theory of indirect standing in *United States v. Texas*, 599 U.S. 670 (2023). As here, the plaintiff States in *Texas* argued that the challenged policy would increase the number of unlawful immigrants in the United States and thereby would increase the States' social-services costs. *See id.* at 674; Response Brief at 13, *United States v. Texas*, No. 22-58 (U.S. Oct. 18, 2022). The

---

[7] Plaintiffs' complaint alleges they will expend additional "education, healthcare, law enforcement, public assistance, and other limited resources" due to the final rule, App. 36; R. Doc. 27, at 10, but they submitted evidence concerning only driver's licenses and education. In any event, none of these types of expenditures would establish standing for the same reasons that plaintiffs' arguments concerning driver's licenses and education fail.

Supreme Court rejected that argument, explaining that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Texas*, 599 U.S. at 680 n.3. When a State asserts "that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* Thus, the Court held that the plaintiffs' assertions that they would suffer increased education and healthcare costs failed to "overcome[] the fundamental Article III problem with [their] lawsuit." *Id.*; *see also Alliance*, 602 U.S. at 383 ("The causation requirement … rules out attenuated links—that is, where the government action is so far removed from its distant … ripple effects that the plaintiffs cannot establish Article III standing.").

The reasoning of *Texas* applies directly to this case. The final rule does not regulate a State's provision of driver's licenses or public education, and any impact that the rule might have on the expenditures North Dakota makes for those services is indirect, attenuated, and of the type that could be attributed to virtually any federal regulation.

The standing theory recognized by the district court is at odds with bedrock principles of our federal system, in which the United States and States share sovereignty over the same territory and people. When a State suffers a "*direct* injury" at the hands of the federal government, it may be able to sue the United States. *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (holding that Florida lacked necessary direct injury to challenge federal inheritance tax alleged to have economic effects on the

19

State); *see also Biden v. Nebraska*, 600 U.S. 477, 489-490 (2023) (finding standing where federal plan "directly injure[d]" the State by causing approximately $44 million in revenue loss under contracts with the federal government). But a State cannot sue the federal government based on the indirect effects of the United States' policies regulating the people within the State. *See Mellon*, 273 U.S. at 18. Such policies will inevitably have derivative consequences for the State itself, but deeming judicially cognizable States' interests in avoiding such incidental effects is inconsistent with the autonomy of the national and state sovereigns to act directly upon individuals "'within their respective spheres.'" *Printz v. United States*, 521 U.S. 898, 920 (1997). That is particularly true where those effects derive from the independent actions of individuals in the State.

The district court's and plaintiffs' theory of standing has startling implications. On their view, any federal action that increases, even indirectly, the number of immigrants in a State creates standing because the State may increase its expenditures in response. Other States could use equivalent logic to claim injury from any federal action *reducing* their immigrant populations, on the theory that immigrants pay state taxes and otherwise contribute economically to the State. If such incidental financial effects satisfied Article III, every immigration-policy dispute between the federal government and the States would end up in federal court.

Nor is the problem limited to immigration. Virtually any federal action—from prosecuting crime to imposing taxes to managing federal property—could incidentally affect state populations and finances. The Supreme Court's decision in *Massachusetts v. Laird*, 400 U.S. 886 (1970), *cited in Texas*, 599 U.S. at 680 n.3, shows where plaintiffs' theory leads. There, Massachusetts sued the Secretary of Defense to enjoin the Vietnam War. The Court summarily rejected the suit, *id.* at 886, but Justice Douglas argued in dissent that the State had standing, *id.* at 887-891 (Douglas, J., dissenting). On plaintiffs' theory, the Court was wrong, and Justice Douglas was right. Surely the Vietnam War caused at least one dollar of peripheral harm to Massachusetts, such as the diminution of drafted residents' taxable income. Because almost every federal policy will affect the people within the States, almost every federal policy will indirectly affect the States themselves. If such effects satisfy Article III, "what limits on state standing remain?" *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022); *cf. Alliance*, 602 U.S. at 392 (rejecting approach under which "[t]eachers in border states could sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms").

The district court did not address the limitations on Article III standing that apply when a State challenges a federal regulation, nor did it attempt to distinguish *Texas*. The court instead cited a concurrence expressing "questions" with the Court's holding in *Texas*. App. 190; R. Doc. 117, at 10 n.7 (citing *Texas*, 599 U.S. at 688 (Gorsuch, J., concurring in the judgment)); Add. 10; *see Texas*, 599 U.S. at 687

21

(Gorsuch, J., concurring in the judgment). But such questions do not allow a district court to disregard a Supreme Court holding. Plaintiffs' allegations of injury based on social-services expenditures are not of a type that might give a State standing to challenge a federal regulation.

**2.** Even if their purported injuries were cognizable, plaintiffs have not made a "clear showing" that such harms are "real and immediate," traceable to the final rule, and redressable by a court. *Murthy*, 603 U.S. at 58 (quotation marks omitted); *cf. California v. Texas*, 593 U.S. 659, 675 (2021) (rejecting standing where States could not establish the "factual premise of their claim"). Rather than increasing plaintiffs' social-services expenditures, the final rule is likely to decrease them. As plaintiffs note, States are obligated to pay certain emergency-healthcare costs of undocumented immigrants who otherwise meet Medicaid eligibility criteria. *See* App. 60; R. Doc. 27, at 11; 42 C.F.R. §§ 435.406(b), 435.139, 440.255(c). The final rule will result in more DACA recipients having health insurance and increase access to preventive and non-emergency care, thus reducing plaintiff States' emergency-care burden. *See* 89 Fed. Reg. at 39,406.

Plaintiffs fare no better on traceability or redressability because they failed to adequately support their contentions that, but for the final rule, their social-services expenditures would imminently be reduced by DACA recipients leaving the State's territory. To be considered for DACA, individuals must have resided continuously in the United States since June 2007. 8 C.F.R. § 236.22(b)(2). "[N]either logic nor

22

intuition" suggests that, after nearly two decades in the United States, during which they have not been able to obtain insurance through an exchange, any of these individuals is likely to leave imminently, or that any plans to depart would change because they are newly eligible to enroll in a QHP. *California*, 593 U.S. at 676. The States also have provided no reason to suspect that the preliminary injunction will cause DACA recipients to leave, particularly when the pull of family, steady employment, community, religious freedom, and relative safety could easily lead them to stay, as they have for many years. Plaintiffs "cannot 'rely on speculation about the unfettered choices made by independent actors not before the courts'"—in this case DACA recipients. *Alliance*, 602 U.S. at 383; *see id.* ("The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs."). Yet that is exactly what plaintiffs do here.

Plaintiffs' only evidence on this issue, a declaration signed by Steven Camarota, a researcher at the think tank Center for Immigration Studies, does not come close to satisfying their burden of showing that DACA recipients would predictably leave the country but for the final rule making them eligible for exchange-based health-insurance plans. Camarota states that "a significant number of illegal immigrants leave the country on their own each year," and that the availability of QHPs "*can* impact the migration decision of immigrants." App. 75-76; R. Doc. 35-1, at 3-4 (emphasis added). But Camarota does not address the decisionmaking of DACA

23

recipients in particular—a unique group because of the length of their continuous residence in the United States, the fact that they were brought to the country as children, *see* 8 C.F.R. § 236.22(b)(1), and their receipt of deferred action and eligibility for employment authorization, *id.* § 236.21(c); *id.* § 274a.12(c)(33). Indeed, plaintiffs did not submit any evidence regarding DACA recipients' immigration decisions or motivations.

Even if the intentions of DACA recipients could be divined from the migration patterns of undocumented immigrants in general, plaintiffs still could not rely on statistical probabilities to establish North Dakota's standing. "[T]he mere statistical likelihood that the regulations would harm the plaintiffs in the future [i]s insufficient" to establish standing. *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 498-499 (2009). Furthermore, Camarota's reliance on probabilities is particularly uncompelling given that only about 130 identified DACA recipients reside in North Dakota, App. 188; R. Doc. 117, at 8; Add. 8, and only 27% of DACA recipients are currently uninsured, 89 Fed. Reg. at 39,425. The source that Camarota relies upon shows that only a tiny percentage of undocumented immigrants depart voluntarily each year, and it provides no information suggesting how many of those individuals would have stayed if they were eligible for QHPs. *See* Robert Warren, *Reverse Migration to Mexico Led to US Undocumented Population Decline: 2010 to 2018*, 8 J. on Migration & Hum. Sec. 32, 33-34 (2020), https://journals.sagepub.com/doi/epub/10.1177/2331502420906125. There

24

is no reason to believe that the preliminary injunction will cause any of the approximately 35 uninsured DACA recipients residing in North Dakota to leave the State or country.

In any case, the district court did not rely on Camarota's declaration or any other evidence that might establish that North Dakota's alleged injury is traceable to the final rule. Rather, the court "conclude[d], through a common-sense inference, that the powerful incentive of health care will encourage aliens who may otherwise vacate the [p]laintiff States to remain." App. 189; R. Doc. 117, at 9; Add. 9. That reasoning is flawed for multiple reasons.

First, the district court's "inference" amounted to impermissible "speculation about the unfettered choices made by independent actors not before the courts." *Alliance*, 602 U.S. at 383 (quotation marks omitted). To "thread the causation needle in th[ese] circumstances, the plaintiff must *show* that the third parties will likely react in predictable ways that in turn will likely injure the plaintiffs," *id.* (emphasis added) (quotation marks omitted); reliance on inference is insufficient. The district court cited *Department of Commerce v. New York*, 588 U.S. 752 (2019), and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972), but those cases held that a district court, as the trier of fact, may make reasonable inferences on the basis of evidence presented at trial—including about the likely conduct of third parties. Here, the district court relied on no evidence in support of its supposedly "common-sense inference." App. 189; R. Doc. 117, at 9; Add. 9.

25

Second, even if inference could suffice to establish standing, the district court's inference is unreasonable because it assumes the premise that there are "aliens who may otherwise vacate the Plaintiff States." App. 189; R. Doc. 117, at 9; Add. 9. As explained above, DACA recipients have necessarily resided in the United States for more than 17 years without having been eligible for insurance on the exchanges; there is no reason to think that they would now leave unless they gain such eligibility. The district court noted that there are roughly 147,000 DACA recipients who are newly eligible for exchange-based insurance plans under the final rule, apparently in an attempt to suggest that there must be some individuals in that large group who are considering leaving the United States. *See* App. 189; R. Doc. 117, at 9; Add. 9. But many of those 147,000 DACA recipients reside outside the plaintiff States, and only a tiny percentage live in North Dakota. As explained earlier, there are likely approximately 35 uninsured DACA recipients residing in North Dakota. Even if it were plausible to assume that one of the roughly 147,000 DACA recipients who are eligible for exchange-based plans under the final rule was contemplating leaving the country, it was not plausible for the district court to assume that any of the roughly 35 North Dakota recipients who are newly eligible was likely to leave the State absent the final rule.

Third, the district court's conclusion that North Dakota is likely to incur additional education costs because of the final rule is flawed for yet another reason. *See* App. 188; R. Doc. 117, at 8; Add. 8. The State had asserted that "at least one of

26

the 126 identified DACA recipients [in North Dakota] are either currently enrolled in the … public education system or have dependents that are." R. Doc. 111, at 3. The youngest DACA recipient in North Dakota is 22 years old, however, and thus age-ineligible for public education. *See* App. 163; R. Doc. 90-1, at 2; N.D. Cent. Code Ann. § 15.1-06-01(1)(c). And it is highly speculative to think that a DACA recipient's dependent—who is likely to be a U.S. citizen and eligible for health insurance on the exchanges even without the final rule—would leave the country even if one of their parents (the DACA recipient) were to leave. Accordingly, the district court's reliance on alleged indirect effects on North Dakota's education expenditures is particularly speculative.

## B. The Preliminary Injunction Should Be Reversed Because Venue Was Improper.

Plaintiffs allege that venue was proper pursuant to 28 U.S.C. § 1391(e)(1)(C), App. 53; R. Doc. 27, at 4, which provides that an action against the United States may be brought "in any judicial district in which … the plaintiff resides if no real property is involved in the action," 28 U.S.C. § 1391(e)(1)(C). As the district court recognized, "[f]or venue to be proper" in the District of North Dakota, "North Dakota must have standing independent of the other [p]laintiffs." App. 185; R. Doc. 117, at 5; Add. 5. Because North Dakota lacks standing, the district court should have granted the federal government's motion to dismiss or transfer for improper venue.

27

The Court's decision in *Maybelline* clearly establishes that a district court's preliminary injunction should be reversed when venue was improper. 813 F.2d at 902-903. In opposing defendants' motion for a stay pending appeal, plaintiffs attempted to distinguish *Maybelline* because it involved a different venue provision. Stay Opp'n 20. But whether plaintiffs assert venue under 28 U.S.C. § 1391(b) or § 1391(e)(1)(C) is irrelevant. *Maybelline*'s key point is that this Court should vacate an injunction issued by a court lacking venue. Indeed, any other rule would promote forum-shopping for preliminary relief by permitting one plaintiff with standing to secure an injunction in any forum to which another plaintiff (no matter how lacking in standing) can lay claim. This Court should reject such venue manipulation.

Other courts have rejected similar attempts to establish venue based on the residence of a party without standing. In *Georgia Republican Party v. SEC*, for example, the state Republican parties of Georgia, New York, and Tennessee petitioned for review of a Securities and Exchanges Commission order in the Eleventh Circuit. 888 F.3d 1198, 1199-1201 (11th Cir. 2018). The court held that the Georgia petitioner lacked standing and dismissed that petitioner. *Id.* at 1201-1205. The court then explained that, without the Georgia petitioner, the Eleventh Circuit was not an appropriate venue for the suit. *Id.* at 1205. The court thus transferred the case to the D.C. Circuit, which all parties agreed would be a proper venue. *Id.* Likewise, in *Railway Labor Executives' Ass'n v. ICC*, the Ninth Circuit considered whether two petitioners that could establish venue had standing, even though the respondents did

28

not challenge the standing of a third petitioner that could not establish venue. 958 F.2d 252, 255-256 (9th Cir. 1991). Thus, while plaintiffs can establish a court's jurisdiction by demonstrating that any one plaintiff has standing, *see Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006), they can establish proper venue under 28 U.S.C. § 1391(e)(1)(C) only by demonstrating that the local plaintiff has standing. Because North Dakota lacks standing, venue is improper in the District of North Dakota regardless of the standing of any other plaintiff, and the case should have been dismissed or transferred to a proper venue.

Plaintiffs also argued, in opposing the stay motion, that this Court does not have jurisdiction to consider the denial of defendants' motion to dismiss or transfer for lack of venue. Stay Opp'n 18-19. But the Court certainly has jurisdiction to consider venue because it is "'inextricably intertwined' with the district court's grant … of [plaintiffs'] claim for injunctive relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 892 (8th Cir. 2013). As explained earlier, *Maybelline* establishes that a district court should not issue a preliminary injunction if venue is improper, and consistent with that rule, the district court addressed the threshold venue issue before considering whether to grant a preliminary injunction, *see* App. 185-190; R. Doc. 117, at 5-10; Add. 5-10. Thus, regardless of whether the denial of defendants' motion to dismiss or transfer is itself appealable, the Court can consider venue in determining whether the district court properly issued a preliminary injunction.

29

In any event, in *Maybelline*, the Court explained that "an appeal from an order granting or refusing injunctive relief pursuant to 28 U.S.C. § 1292(a)(1) presents for appellate review the entire order, not merely the propriety of injunctive relief." 813 F.2d at 903 n.1 (alteration and quotation marks omitted). The district court's order granting injunctive relief here also denied the government's motion to dismiss or transfer for improper venue. *See* App. 182, 198; R. Doc. 117, at 2, 18; Add. 2, 18. Accordingly, "the district court's denial of the [federal government's] motion to dismiss for improper venue is properly before" the Court. *Maybelline*, 813 F.2d at 903 n.1. And for the reasons explained herein, the Court should reverse the denial of that motion.

### C. Although The Court Need Not Reach The Issue, The Remaining Plaintiffs Also Lack Standing.

For the reasons just explained, the Court should reverse the preliminary injunction and remand with instructions to dismiss the action or transfer it to a proper venue. The transferee court could then consider the remaining plaintiffs' standing. This Court need not address the standing of any plaintiff other than North Dakota. *See Georgia Republican Party*, 888 F.3d at 1205 n.1 (explaining that the Court "need not—and d[id] not—address whether the [remaining petitioners] ha[d] standing, because 'jurisdiction is vital only if the court proposes to issue a judgment on the merits.'" (alteration omitted)).

30

In any event, none of the plaintiffs has standing. Fifteen of the remaining 18 plaintiff States are in a position similar to that of North Dakota: They use the FFE, allege no direct injury from the final rule, and seek to establish standing based only on alleged indirect effects the final rule might have on their social-services expenditures. Their assertions of standing fail for the same reasons that North Dakota's does— because such indirect effects are insufficient to establish Article III standing and because plaintiffs have not demonstrated that their alleged injuries are traceable to the final rule or redressable by an injunction.

The other three plaintiff States—Idaho, Kentucky, and Virginia—run SBEs, and plaintiffs allege that they have standing based on administrative costs they incurred to change their eligibility and enrollment platforms. As defendants explained to the district court, R. Doc. 61, at 16-19, plaintiffs failed to establish that they actually incurred (or were going to incur) any such costs. The final rule recognizes that SBEs would need to update their eligibility and enrollment platforms, but HHS estimated that the necessary changes could be performed in 100 hours. 89 Fed. Reg. at 39,423. Idaho, Kentucky, and Virginia have not shown that they had to hire any additional staff, pay existing staff more, or forgo other work to make these relatively minor changes, or that, if they work with a vendor to address eligibility updates, the necessary work was not covered by an existing contract. *Cf. Alliance*, 602 U.S. at 390-391 (holding that doctors lacked standing where they did not show "both" an increase in patient numbers "*and* … a resulting diversion of the doctors' time and resources").

31

For example, it appears that Kentucky contracts with an "IT Vendor/System Integrator" to address its eligibility systems. Berry Dunn McNeil & Parker LLC, *Kentucky Health Benefit Exchange (KHBE)*: *Programmatic Compliance Report* 7-8 (June 21, 2024), https://perma.cc/D8E2-AF8M. Kentucky has not shown that any rule-related eligibility updates were not already covered by such contracts. The noncommittal declaration of a former Kentucky official who left government service in 2019 before Kentucky reestablished its SBE, *see* App. 90-91, 95; R. Doc. 35-2, at 1-2, 6, was plainly insufficient to establish such costs. *See* App. 95-96; R. Doc. 35-2, at 6-7 (surmising where certain funds "most likely" come from and stating that there would "almost certainly be a cost impact" "to the best of [his] knowledge"). Indeed, given that Kentucky has access to current information and its own current officials, it is suspect that it relies on the declaration of a former official with outdated knowledge. Nor can plaintiffs rely on the final rule, which provides an estimate of the number of hours that it would take for a State to update its exchange but does not address whether any particular State had the capacity to make those changes without incurring any actual costs or whether States had contracted for third parties to incur the costs of the updates required by the final rule.

In any event, by the time the preliminary injunction issued on December 9, 2024, open enrollment had begun more than a month earlier, so all necessary updates to the SBEs would have already been completed. Thus, at the time of the injunction, any cost to update the SBEs was a past harm. And because plaintiffs seek only

32

"forward-looking relief," they "must establish a substantial risk of *future* injury that is traceable to the Government defendants and likely to be redressed by an injunction against them." *Murthy*, 603 U.S. at 69 (emphasis added); *see also id.* at 58 (plaintiffs must demonstrate a substantial risk that they will suffer injury "in the near future"). Evidence of past injury is not sufficient. *Id.* at 59. Thus, even if Idaho, Kentucky, and Virginia had standing based on the future costs of updating their exchanges at the time they filed their complaint, their injuries could no longer support standing by the time the district court issued the preliminary injunction because the court could not redress their past monetary injury.[8]

The final rule also acknowledged that SBEs would need to spend an average of 10 minutes assisting each DACA-recipient enrollee and processing their applications. 89 Fed. Reg. at 39,424. Again, plaintiffs have not made any showing that performing these functions will require them to hire additional staff or otherwise increase expenditures. According to HHS's estimates, the new rule will result in approximately 602 additional applications in Kentucky, 608 in Idaho, and 2,109 in Virginia. *See* 89 Fed. Reg. at 39,428 (estimating that 27% of DACA recipients are uninsured); App. 57-58; R. Doc. 27, at 8-9 (listing number of DACA recipients in plaintiff States). This

---

[8] The SBEs may now have rolled back the necessary updates or made additional system updates in light of the preliminary injunction. However, because the initial system updates to comply with the rule were previously implemented, it is highly speculative to think that plaintiffs would now suffer any future harm from re-implementing those updates if the preliminary injunction is vacated.

Appellate Case: 24-3521     Page: 45     Date Filed: 01/21/2025 Entry ID: 5476436

amounts to an increase of approximately 0.53-0.80% of enrollees on those SBEs. *See* Centers for Medicare & Medicaid Services, HHS, *Health Insurance Marketplaces 2024 Open Enrollment Report* 5-6, https://perma.cc/FZQ6-X5Y2. There is no evidence suggesting that the exchanges could not absorb such a small increase without additional staff or expenditures. *Cf. Alliance*, 602 U.S. at 390-391.

Furthermore, any costs to the exchanges in updating their platforms or assisting new enrollees are likely to be offset by additional revenue generated by DACA recipients enrolling in insurance plans on the exchanges. Every SBE must have sufficient funding to carry out its obligations under the ACA, 42 U.S.C. § 18031(d)(5)(A), and for that reason, States like Kentucky assess a fee to users or issuers (based on pre-subsidy premiums) to cover the cost of determining eligibility, certifying QHPs, and so on, *see, e.g.*, Ky. Rev. Stat. Ann. § 304.17B-021(1)(a). Plaintiffs have not shown that they would incur any net costs, as opposed to net benefits, by opening the exchanges to more individuals. *See Henderson v. Stalder*, 287 F.3d 374, 379 (5th Cir. 2002) (holding that taxpayers lacked standing to challenge State's issuance of specialized license plates when the plates' cost was offset by fee charged to motorists electing to use the plates).

Plaintiffs previously argued, in opposing defendants' motion for a stay pending appeal, that they "will face increased administrative and system costs when they are forced to distribute ACA exchange subsidies." Stay Opp'n 16-17. But the "subsidies" plaintiffs reference are refundable federal tax credits that the federal government may

34

advance and pay to insurance carriers. *See* 26 U.S.C. § 36B (establishing refundable credit); 42 U.S.C. § 18081 (providing for the Secretary to establish a program for determining eligibility); *id.* § 18082(c)(2) (providing that the Treasury Secretary makes any advance payment of credits). Plaintiffs identify no way in which the federal government's distribution of federal tax credits may harm the States.

## II.   THE GOVERNMENT IS LIKELY TO SUCCEED ON THE MERITS

Even assuming that plaintiffs could establish standing and proper venue, the federal government is likely to succeed on the merits. Contrary to the fundamentally mistaken analysis underlying the district court's likelihood-of-success holding, Congress specifically empowered HHS to define who is "lawfully present" for purposes of the ACA, and HHS acted entirely lawfully in adopting an understanding of that term well-established across federal benefits statutes both at the time Congress enacted the ACA and today.

### A.   The Rule's Definition Of "Lawfully Present" Comports With The Executive Branch's Established Understanding Of This Term Across Federal Benefits Statutes.

**1.** The ACA establishes specific eligibility criteria for who may enroll in a QHP through an exchange and obtain federal subsidies, providing among other things that those "not reasonably expected to be … a citizen or national of the United States or an alien lawfully present in the United States" during the entire period for which an enrollment is sought are ineligible for such plans. 42 U.S.C. § 18032(f)(3); *see also id.* § 18071(e)(2). Congress empowered HHS to define such eligibility provisions, giving

35

HHS the authority to "establish a program … for determining … whether an individual … meets the requirement[] of section[] 18032(f)(3) … that the individual be … an alien lawfully present in the United States." *Id.* § 18081(a)(1). And it directed the agency more generally to "issue regulations setting standards for meeting the requirements under this title," including "with respect to … the establishment and operation of Exchanges." *Id.* § 18041(a)(1).

Although the ACA leaves to HHS the task of defining the phrase "lawfully present," that language had a significant history in federal law when Congress incorporated it into the ACA in 2010. Congress used that phrase in PRWORA in 1996, distinguishing between "qualified alien[s]" and "alien[s] who [are] lawfully present" for purposes of Social Security benefits. *See* 8 U.S.C. § 1611(a), (b)(2). Congress defined the former strictly, *see id.* § 1641(b) (listing those considered "qualified alien[s]"), but it left the latter to be defined by the Attorney General (and now the Secretary of Homeland Security), *see id.* § 1611(b)(2). Promptly after PRWORA's enactment, the Executive Branch promulgated a regulation defining "lawfully present" noncitizens under § 1611(b)(2) to include those "in deferred action status." 61 Fed. Reg. at 47,040 (explaining such persons fall within that term because they "remain in the United States under a Presidential or administrative policy that permits them to do so"); *see* 8 C.F.R. § 1.3. Far from overruling this definition or in any way suggesting disapproval of the determination that deferred-action recipients can be considered "lawfully present" for some purposes, when Congress subsequently

36

amended PRWORA, it expanded the Executive Branch's discretion to deem noncitizens lawfully present for purposes of receiving certain other federal benefits too. *See* 8 U.S.C. § 1611(b)(3)-(4); Balanced Budget Act of 1997, Pub. L. No. 105-33, § 5561, 111 Stat. 251, 638.

DHS subsequently reinforced this understanding, determining that the period during which a noncitizen has been granted deferred action is a "period of stay authorized by the Attorney General" under 8 U.S.C. § 1182(a)(9)(B)(ii), during which a noncitizen does not accrue unlawful presence. *See* 87 Fed. Reg. at 53,208 & n.203; Memorandum from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, to Field Leadership, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* 42 (May 6, 2009) (noting that "[a]ccrual of unlawful presence stops on the date an alien is granted deferred action"); Memorandum from Johnny N. Williams, Executive Associate Commissioner, Office of Field Operations, to Regional Directors, *Re: Unlawful Presence* 1 (June 12, 2002) (similar determination in memorandum subsequently rescinded and consolidated in the May 6, 2009 memorandum).

These determinations underscore that, as the Seventh Circuit has recognized, "unlawful presence and unlawful status are distinct concepts in the argot of immigration specialists." *Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013). Lawful presence has long been understood to encompass an individual "who is (under the

37

law as enacted by Congress) subject to removal, and whose immigration status affords no protection from removal, but whose temporary presence in the United States the Government has chosen to tolerate, including for reasons of resource allocation, administrability, humanitarian concern, agency convenience, and other factors." 87 Fed. Reg. at 53,209; *see also Chaudhry*, 705 F.3d at 292 (recognizing that "[i]t is entirely possible for aliens to be lawfully present (*i.e.*, in a 'period of stay authorized by the Attorney General') even though their lawful status has expired"). And indeed, for deferred-action recipients specifically, it has been clear for over three decades that such individuals are "lawfully present" for certain purposes, including receiving some federal benefits, even though they lack an immigration status protecting them from removal.

2. Consistent with this longstanding understanding, when HHS first defined "lawfully present" under the ACA in 2010, it included not only "qualified alien[s]" as defined by PRWORA, but also "[a]liens currently in deferred action status." 75 Fed. Reg. at 45,030 (listing 45 C.F.R. § 152.2(1), (4)(vi)). When DACA was originally created in 2012, HHS declined to put DACA recipients on the same footing as other deferred-action recipients under the ACA, instead specifically excluding them from ACA exchanges. *See* 77 Fed. Reg. at 52,615. That choice was not rooted in any view that DACA recipients could not be considered "lawfully present" within the ACA's meaning, but rather on HHS's then-held view that it "would not be consistent with

38

the reasons offered for adopting the DACA process to extend [ACA] health insurance subsidies … to these individuals." *Id.*

In the challenged rule, HHS changed its policy, deciding to align all deferred-action recipients for purposes of exchange eligibility after the COVID pandemic and DHS's 2022 promulgation of a DACA regulation. In the DACA regulation, DHS explained that, "while there is no express definition of 'lawfully present' or 'unlawfully present' for all purposes, Congress clearly authorized the [DHS] Secretary to determine who is 'lawfully present' for certain purposes" under PRWORA. 87 Fed. Reg. at 53,209. Within the scope of its authority, DHS determined that those purposes include permitting a noncitizen to obtain employment authorization and calculating admissibility limits during periods of "unlawful presence" under 8 U.S.C. § 1182(a)(9)(B)(i). *See* 87 Fed. Reg. at 53,209. But as DHS noted, it did not have the authority to change the definition of "lawfully present" for purposes of healthcare programs. *See id.* at 53,211-53,212.

HHS does have such authority, and in its 2024 rule, it "determined that changing its own definitions of 'lawfully present' … is consistent with DHS' explanation" of its own definition of "lawfully present" in the DACA regulation and better "effectuate[s] congressional intent in the ACA." 89 Fed. Reg. at 39,395. HHS's decision to treat all otherwise eligible deferred-action recipients as eligible to enroll in ACA health-insurance plans simply accords with the longstanding recognition that such noncitizens may be considered "lawfully present" for federal-benefits-related

39

purposes, even though they are not "lawfully in the United States for all purposes." 87 Fed. Reg. at 53,209 (explaining "'lawful presence' is a term of art, and very different from 'lawful status'"); *see* 89 Fed. Reg. at 39,395; *see also Chaudhry*, 705 F.3d at 292. That understanding existed when Congress enacted the relevant ACA language, and Congress has declined to disturb it over almost three decades. *See, e.g., Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) (presuming "Congress is aware of existing law when it passes legislation" (quotation marks omitted)); *Fisher v. Pension Benefit Guar. Corp.*, 994 F.3d 664, 671 (D.C. Cir. 2021) (noting Congress is "presumed to preserve, not abrogate, the background understandings against which it legislates" (quotation marks omitted)); *see also Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (recognizing that, "[w]hen a statutory term is obviously transplanted from another legal source, it brings the old soil with it." (quotation marks omitted)).

Indeed, plaintiffs' own interpretations of similar state-law terms highlight that considering noncitizens with deferred action "lawfully present" is reasonable. Kansas, for instance, bars issuance of driver's licenses to those "[w]hose presence in the United States is in violation of federal immigration laws," Kan. Stat. Ann. § 8-237(i), yet considers an applicant "lawfully present in the United States" if he "has approved deferred action status," *id.* § 8-240(b)(2)(H). Indiana and South Dakota equate "lawful status" with having "approved deferred action status." Ind. Code Ann. §§ 9-13-2-92.3(a)(2)(G), 9-24-11-5(c)(4); S.D. Codified Laws § 32-12-1.1(7). Other States restrict

40

license issuance to persons without "authoriz[ation]" to be in the United States, *see, e.g.*, Mont. Code Ann. § 61-5-105(10), or who are "not lawfully present," Idaho Code Ann. § 49-303(14). Yet the States represented below that they issue licenses to DACA recipients. *See* R. Doc. 35, at 17.

## B. The District Court's Contrary Conclusions Were Erroneous.

The district court erred in suggesting that because DACA is only a "reprieve" from removal, and DACA recipients "lack lawful immigration status," they must be "not lawfully present." App. 191-93; R. Doc. 117, at 11-13; Add. 11-13. The district court rested this view on the profoundly mistaken belief that it reflects "[t]he law of the land before the [f]inal [r]ule." App. 193; R. Doc. 117, at 13; Add. 13. As previously discussed, for almost three decades and against repeated congressional amendment of PRWORA and the ACA, "lawfully present" has been understood as a statutory term of art encompassing noncitizens subject to removal but with a grant of deferred action. Indeed, DACA recipients specifically have always been considered "lawfully present" and thus eligible for Social Security benefits under PRWORA. *See* 87 Fed. Reg. at 53,208. The final rule aligns the treatment of DACA recipients with the long-time understanding of lawful presence and treats all deferred-action recipients similarly for purposes of exchange eligibility.[9]

---

[9] To the extent the district court read decisions from the Eleventh Circuit and the Fifth Circuit to articulate a contrary view, *see* App. 191-92; R. Doc. 117, at 11-12; Add. 11-12 (citing *Estrada v. Becker*, 917 F.3d 1298, 1305 (11th Cir. 2019), and *Texas v.*

41

Next, the district court incorrectly suggested that PRWORA bars treatment of DACA recipients as "lawfully present." *See* App. 194; R. Doc. 117, at 14; Add. 14. The court stated that Congress established "categories of those who are qualified aliens in 8 U.S.C. § 1611(b), and nowhere does it state deferred action aliens are qualified aliens." *Id.* But PRWORA's separate descriptions of "qualified alien[s]" and "alien[s] who [are] lawfully present" reflects Congress's view that the latter category is broader than the former. *See* 8 U.S.C. § 1611(a), (b)(2). Thus, treating DACA recipients as "lawfully present," even though they are not "qualified aliens," is fully consistent with PRWORA.

Nor is the final rule incompatible with PRWORA's general limitation of "Federal public benefits" to "qualified aliens," "[n]otwithstanding any other provision of law." 8 U.S.C. § 1611(a). Congress later made a more specific, and broader, eligibility decision in the ACA by limiting QHP-enrollment eligibility not just to "qualified aliens" but rather to noncitizens "lawfully present in the United States." *See* 42 U.S.C. § 18032(f)(3). "It is a commonplace of statutory construction that the specific governs the general," *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017)

---

*United States*, 50 F.4th 498, 526 (5th Cir. 2022)), neither decision addressed the ACA, 42 U.S.C. § 18032(f)(3), in any way, or engaged meaningfully with the backdrop against which Congress enacted that provision. *See, e.g.*, *Texas*, 50 F.4th at 509 (simply noting deferred-action recipients "were deemed 'lawfully present' under pre-existing federal regulations"); *Estrada*, 917 F.3d at 1304-1305 (discussing only the provision relating to accrual of "unlawful presence" set out in 8 U.S.C. § 1182(a)(9)(B)(ii) without considering, *inter alia*, the longstanding definition of "alien who is lawfully present in the United States" in 8 C.F.R. § 1.3).

Appellate Case: 24-3521     Page: 54     Date Filed: 01/21/2025 Entry ID: 5476436

(alteration omitted) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)), and, in particular, "[a] specific provision generally takes precedence over a general provision adopted earlier," *United States v. Kidd*, 963 F.3d 742, 748 (8th Cir. 2020). While often true where "a general … prohibition is contradicted by a specific …permission," *RadLAX*, 566 U.S. at 645, this rule also governs construction of a general prohibition and a more specific prohibition, *cf. id.* (addressing statutes "in which a general authorization and a more limited, specific authorization exist side-by-side"). Interpreting the "'general enactment … to affect only such cases within its general language as are not within the provisions of the particular enactment'" avoids "the superfluity of a specific provision that is swallowed by the general one." *Id.* at 645-646 (quoting *United States v. Chase*, 135 U.S. 255, 260 (1890)); *see also Kidd*, 963 F.3d at 748-749 (recognizing Court's duty "[t]o give effect, if possible, to every provision" of the relevant statutes). If Congress intended PRWORA to limit ACA eligibility to "qualified aliens," it would have had no need to specify that ACA eligibility is limited to the broader category of those "lawfully present." The district court should have given effect to both provisions by construing the ACA's more specific provision as an exception to PRWORA's more general one, or the more recent ACA as modifying the older PRWORA, *cf. Dorsey v. United States*, 567 U.S. 260, 274 (2012) ("Congress … remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, [or] to modify the earlier statute,

43

… either expressly or by implication.").  Either way, the ACA's particular criteria control.

Finally, the district court erred in evaluating only whether plaintiffs have "a fair chance of prevailing" on the merits.  App. 193; R. Doc. 117, at 13; Add. 13.  Such a determination is inadequate to support injunctive relief under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which requires "likely" success.  *Id.* at 20.  To the extent this Court has suggested a lower "fair chance" standard sometimes applies, it has recognized it does not where, as here, "a party seeks to enjoin a government regulation that is based on presumptively reasoned democratic processes."  *Firearms Regulatory Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 517 (8th Cir. 2024) (quotation marks omitted).

## III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH STRONGLY AGAINST A PRELIMINARY INJUNCTION

### A.  The Injunction Is Unnecessary To Prevent Irreparable Harm To Plaintiffs.

For the same reasons that plaintiffs fail to demonstrate any injury sufficient to establish standing, they also have not shown that they are likely to suffer any irreparable harm in the absence of an injunction.  As previously explained, the final rule is highly unlikely to lead any DACA recipient who would otherwise have left the plaintiff States to remain there, *see supra* pp. 22-27, and an injunction is likewise unlikely to lead any DACA recipient to leave the plaintiff States.  Even if the final rule would cause any DACA recipients to remain, however, any social-services costs

44

incurred by the States are likely to be outweighed by the taxes that DACA recipients will pay. According to one estimate, DACA recipients and their households pay about $3.1 billion in annual state and local taxes. 87 Fed. Reg. at 53,154. Furthermore, allowing the final rule to take effect would decrease plaintiffs' emergency-healthcare costs because it would allow DACA recipients to enroll in QHPs, which would both cover costs that might otherwise be borne by plaintiff States and reduce the insured individuals' emergency-department usage generally by increasing their access to preventive and non-emergency care. *See supra* p. 22. Thus, even if plaintiffs were able to establish standing based on minimal indirect costs they may incur, any such harm is entitled to little or no weight in the equitable balancing.

The district court found that the rule may impose administrative costs on the three plaintiff States that run their own exchanges, App. 195; R. Doc. 117, at 15; Add. 15, but it erred in relying on the final rule's general estimates of the hours required to perform the necessary updates without making any findings about whether plaintiffs would incur actual costs to perform those updates. *See supra* pp. 31-32. Furthermore, as already explained, Idaho, Kentucky, and Virginia would have needed to perform any updates to the eligibility and enrollment platform of their exchanges before open enrollment began on November 1, 2024. The district court erred in granting a preliminary injunction based on past costs. *See Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893 (8th Cir. 2024) ("The party seeking a preliminary injunction

45

… must show a likelihood of irreparable harm in the future," and "past injury alone [is] insufficient."); *cf. Ng v. Board of Regents of the Univ. of Minn.*, 64 F.4th 992, 997-998 (8th Cir. 2023) (delay in seeking preliminary injunction can undermine showing of irreparable harm "if the harm has occurred and the parties cannot be returned to the status quo" (quotation marks omitted)); *Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1015 n.3 (8th Cir. 2021) ("The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." (quotation marks omitted)).

The final rule also estimated that SBEs would need to spend approximately 10 minutes per application to assist new enrollees and process their applications, at an estimated cost of $8.22 per application. 89 Fed. Reg. at 39,424. Again, plaintiffs have not made any showing that performing these functions will require Idaho, Kentucky, or Virginia to hire additional staff or otherwise increase expenditures. *See supra* p. 33-34. Furthermore, any costs to the SBEs are likely to be offset by additional revenue generated by DACA recipients enrolling in insurance plans on the exchanges. *See supra* p. 34. In short, plaintiffs failed "to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

Unable to cite any actual evidence that the final rule will cause plaintiffs any harm during the pendency of this litigation, the district court opined that "allowing potential unlawful action would constitute irreparable harm." App. 195-96; R. Doc. 117, at 15-16; Add. 15-16. But that reasoning impermissibly merges the likelihood-of-

46

success and balance-of-harms inquiries and would mean that a plaintiff has demonstrated irreparable injury whenever it has shown likelihood of success on the merits. The Supreme Court has made clear, however, that "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam). "Rather, a court must also consider whether the movant has shown 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.' " *Id.*; *see also Beber v. NavSav Holdings, LLC*, 118 F.4th 921, 929 (8th Cir. 2024) ("Failure of a movant to show irreparable harm is an independently sufficient basis upon which to deny a preliminary injunction." (alteration and quotation marks omitted)).

## B. A Preliminary Injunction Would Greatly Undermine The Public Interest.

In contrast, the preliminary injunction will cause the government and the public to suffer irreparable injury. Congress passed the ACA—and HHS promulgated the final rule—to expand access to affordable health insurance and thereby improve individuals' health and well-being. 89 Fed. Reg. at 39,396. The preliminary injunction threatens that goal. When the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted); *see Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco,*

47

*Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023) ("The third and fourth factors for a preliminary injunction—harm to the opposing party and the public interest—merge when the Government is the party opposing the preliminary injunction.").

The preliminary injunction also imposes significant, unnecessary costs on the public. Approximately 44,000 previously uninsured DACA recipients live in plaintiff States. *See* 89 Fed. Reg. at 39,428 (estimating that 27% of DACA recipients are uninsured); App. 57-58; R. Doc. 27, at 8-9 (listing number of DACA recipients in plaintiff States). As of December 10, 2024, 2,669 DACA recipients in the 16 plaintiff States using the FFE enrollment platform had already enrolled in insurance plans on the exchanges since open enrollment began on November 1. App. 205; R. Doc. 119-1, at 7. Many more had likely enrolled in insurance plans on the SBEs in Idaho, Kentucky, and Virginia. *Id.* And—but for the injunction issued on December 9— many others would likely have enrolled during the mid-December surge that typically precedes the deadline for enrolling in plans that begin January 1. *See* App. 202-03; R. Doc. 119-1, at 4-5 (describing typical surge in enrollment and showing that more than 5.6 times as many people selected plans on the FFE on December 15, 2023, as on December 9, 2023).

For 876 DACA recipients in the 16 plaintiff States using the FFE enrollment platform, insurance coverage had already begun on December 1, 2024. App. 206-07; R. Doc. 119-1, at 8-9. For others, insurance was set to begin on January 1, 2025. *See*

48

App. 202; R. Doc. 119-1, at 4. But because of the injunction, these DACA recipients have found their 2025 enrollment canceled. *See* App. 205-06; R. Doc. 119-1, at 7-8. These individuals may have had doctor's appointments, surgeries, and treatments scheduled for the coming weeks and months and now—because of the preliminary injunction—will find themselves without insurance coverage to pay for those appointments.

If there were any doubt, proposed-intervenors' filings demonstrate the harm the injunction will cause to individuals. One proposed-intervenor, who lives in Virginia, explained that she was recently diagnosed with leukemia and was without insurance or other means to pay for her treatment. R. Doc. 49-4, at 3. Although the individual was ultimately treated at the hospital's expense, she now needs regular blood tests to monitor for potential recurrence. R. Doc. 49-4, at 4. The proposed-intervenor does not know how she will afford that care unless she is eligible to enroll in health insurance on an exchange. R. Doc. 49-4, at 4-5.[10]

The injunction will decrease access to care, worsen health outcomes, increase health disparities, increase reliance on uncompensated care and emergency-department care, and weaken the workforce, education systems, and local economies.

---

[10] Proposed-intervenors sought to intervene in district court to defend the HHS rule. *See* R. Doc. 49. Plaintiff States and the federal government both opposed intervention, agreeing that the federal government could adequately represent proposed-intervenors' interests. *See* R. Doc. 76, at 2-7; R. Doc. 77, at 6-7. The district court issued its preliminary-injunction order without ruling on the motion to intervene.

49

*See* 89 Fed. Reg. at 39,429. Without access to affordable health insurance, DACA recipients are "less likely to receive preventive or routine health screenings and may delay necessary medical care, incurring high costs and debts." *Id.* at 39,396. For example, another proposed-intervenor, who also lives in Virginia, explained that he has not had a physical in three years, nor has he been tested for diabetes, despite having a family history of the disease. R. Doc. 49-2, at 3. These outcomes can have downstream health impacts that result in longer hospital stays and increased mortality and financial impacts that put individuals at higher risk of food and housing insecurity. 89 Fed. Reg. at 39,396. Moreover, it is not just DACA recipients who are likely to go without health insurance by virtue of the injunction, but also their children—who are likely to be U.S.-born and U.S. citizens—because children are more likely to be insured when their parents have health insurance. *Id.* at 39,402. The injunction will also strain the healthcare system by increasing the use of emergency rooms, *id.* at 39,406, and injure employers because they will have more absentee workers, *id.* at 39,396; *see also* R. Doc. 69, at 4-8 (Amicus Br. of 20 States) (noting negative effects associated with lack of access to health insurance impacting DACA recipients, their U.S.-born children, and their communities).

The significant harms that the injunction will cause DACA recipients, as well as their families, communities, and employers, are plainly irreparable. If defendants prevail in the litigation and DACA recipients can then enroll in health-insurance plans, they will not be reimbursed for prior medical costs they have paid out of

50

pocket. Nor can a final judgment remedy any injuries DACA recipients or their dependents have suffered to their health because of forgone care. A final judgment also will not reimburse hospitals for unpaid emergency-healthcare costs or employers for lost labor.

Instead of considering these harms to the public, the court erred again by conflating the likelihood-of-success inquiry with the public interest. *See* App. 196; R. Doc. 117, at 16; Add. 16. The court reasoned that the public interest does not favor "the perpetuation of unlawful agency action" and stated that "[b]ecause the [c]ourt found the [p]laintiffs have proven likelihood of success on the merits," the public-interest "factor weighs in favor of granting the preliminary injunction." *Id.* (quotation marks omitted). But as with the district court's flawed irreparable-harm analysis, such reasoning would render the public-interest inquiry meaningless whenever a court finds plaintiffs likely to succeed on the merits. For the reasons already explained, such reasoning is inconsistent with decisions of the Supreme Court and this Court, which distinguish between each of the injunctive factors. *See supra* pp. 46-47; *cf. Winter*, 555 U.S. at 23-24 (finding that public interest made preliminary injunction inappropriate regardless of plaintiffs' likelihood of success on the merits and irreparable-harm showing). In any event, the district court abused its discretion by simply ignoring the harm the preliminary injunction will cause DACA recipients and their communities. Those irreparable injuries greatly outweigh any minimal and offset cost that plaintiffs may incur without a preliminary injunction.

# CONCLUSION

For the foregoing reasons, the district court's order granting a preliminary injunction and a stay of the rule's effective date and denying defendants' motion to dismiss or transfer should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

CATHERINE M.A. CARROLL
*Deputy Assistant Attorney General*

MELISSA N. PATTERSON

*s/ Leif Overvold*

LEIF OVERVOLD
JOSHUA M. KOPPEL
*Attorneys, Appellate Staff*
*Civil Division, Room 7226*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*
*leif.overvold2@usdoj.gov*

January 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,998 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

Pursuant to Circuit Rule 28A(h)(2), I further certify that the brief has been scanned for viruses, and the brief is virus free.

*s/ Leif Overvold*

Leif Overvold

# CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Leif Overvold*
Leif Overvold